UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NITOR V. EGBARIN, AND JANET J. EGBARIN | : CASE NO. 3:00 CV 01043 (JCH) |
| Plaintiffs, | : |
| v. | : |
| LEWIS, LEWIS & FERRARO LLC, SCOTT F. LEWIS, CLAUDE J. PICARD AND PAULINE M. PICARD | : FIRST AMENDED COMPLAINT |
| Defendants. | : SEPTEMBER 13, 2004 |

### I.   PRELIMINARY STATEMENT

1. This case arises from transactions involving, among other things, a federally regulated real estate mortgage transaction and from practices of unfair debt collections, fraud, CUTPA and RICO violation by the defendants which practices or acts proximately caused substantial loss to the plaintiff.

### II.   JURISDICTION AND VENUE

2. This court has jurisdiction over this action pursuant to 12 U.S.C. § 632, 15 U.S.C. § 1692k, 18 U.S.C. 1964(c) and 28 U.S.C. § 1331.

1

3. The plaintiff brings this action for redress of injuries sustained as a result of arising out of transactions involving, among other things, real estate mortgage transaction regulated by the Department of Housing and Urban Development, in violation of 18 U.S.C. § § 1012, 1341, 1343, 1344, 1503, and 1961 et seq. and, arises out of misrepresentations, abusive and fraudulent debt collection practices in violation of 15 U.S.C. § 1692.

4. The plaintiff also pleads pendent state claims for relief pursuant to 28 U. S. C. 1367.

5. Venue in this district is appropriate pursuant to 28 U. S. C. 1391 (b) or (c) because this cause of action arose in Connecticut.

### III. PARTIES

6. The plaintiff, Nitor V. Egbarin is a black individual residing in Hartford County, State of Connecticut and operated a law practice business primarily in personal injury claims, in the same county, hereinafter is "Mr. Egbarin."

7. The plaintiff, Janet J. Egbarin is a black individual and wife of Mr. Egbarin residing in Hartford County, State of Connecticut, hereinafter is "Mrs. Egbarin."

8. The defendant, Lewis, Lewis & Ferraro, LLC, is a Connecticut limited liability company operated by the defendant, Scott F. Lewis doing business of law practice generally and regularly in real estate transactions and debt collections in Hartford County, State of Connecticut, hereinafter is "Lewis LLC."

9. The defendant, Scott F. Lewis is a white attorney, who has testified in court as having extensive experience and regularly handles real estate transactions and debt collections, practicing law in Hartford County, State of Connecticut and is the principal, partner and operator of Lewis LLC, hereinafter is "Scott Lewis."

10. The defendant, Claude J. Picard is white and a real estate developer having more than 15 years experience operating as such, in Hartford County, State of Connecticut and is the client of Lewis LLC and Scott Lewis, hereinafter is "Mr. Picard."

3

11. The defendant, Pauline M. Picard is white, the wife and partner of C. Picard, and the client of Lewis LLC and S. Lewis, residing in Hartford County, State of Connecticut, hereinafter is "Mrs. Picard."

## IV.    FACTS

12. On or about September 18, 1992 the plaintiffs and the defendants, Mr. Picard and Mrs. Picard entered into a Purchase, Sale and Lease Agreement hereinafter "Agreement," for the real estate at 8 Northcliff Drive, in Bloomfield Connecticut, hereinafter "Property."

13. The agreement set the purchase price for the property at $330,000, hereinafter, "original purchase price."

14. The Agreement also provided that $500 from each monthly rent would be credited and used toward the purchase price of the property, hereinafter "credits."

15. The credits totaled $10,000 representing $6000 from monthly rents during the first term of the lease, $3000 for the six month extension period of the lease and $1000 for the last month of May 1994.

4

16. In addition to the credits, an "initial deposit" of $1000 and, "additional deposits" of $9000 and $10,000 were required, hereinafter "deposits."

17. The deposits which totaled $20,000 were also to be used toward the purchase price of the property.

18. By the end of May 1994, the credits and deposits totaled $30,000.

19. Proof of these credits and deposits are the multiple checks which were paid to the Picards and cleared through plaintiffs' checking accounts.

20. At various times in 1993, the plaintiff made several attempts to obtain mortgage financing in order to close on the property, but due to credit problems including defaulted student loan and federal tax liens, the plaintiffs were only able to qualify for mortgage financing at unfavorable high interest rates of 12% to 14%.

21. In or about February 1994, the Plaintiffs informed Mr. Picard of his unsuccessful attempts at obtaining suitable mortgage financing to close on the property.

22. Mr. Picard subsequently referred the plaintiff to Mr. Sanborn, the proprietor of Sanborn Mortgage Corporation, "Sanborn," a mortgage broker Mr. Picard said he knew well and with whom he had previously done deals.

23. Mr. Picard said he would talk to Mr. Sanborn, before the plaintiff made contact with him.

24. In March 1994, after Mr. Picard talked to Mr. Sanborn, the plaintiffs applied for the mortgage financing through Mr. Sanborn.

25. Sanborn promptly approved the plaintiffs' application for financing which offered favorable terms and later issued a formal commitment letter dated May 12, 1994, "commitment letter."

26. Sanborn's commitment to finance the property was conditioned on the appraisal of the property and that the purchase price

6

must be equal to the appraised value of the property as
determined by Sanborn's appraiser.

27. However, before May 12, 1994, Sanborn's appraisal determined
that the property was valued at $300,000.

28. The commitment letter specifically required "[a] fully
executed addendum to the purchase and sales agreement for 8
Northcliff Drive verifying the purchase price of $300,000."

29. The defendants were unhappy with this requirement in the
commitment letter but proceeded with the transaction for reasons
that would later become apparent and described below.

30. Apparently, the defendants had developed this property on
the speculation that they would benefit from the then booming
real estate market.

31. However, before the defendants finished the construction,
the real estate market had crashed.

32. The property was originally listed in the "MLS," the real
estate property network, for the sum of $459,000.

33. By the time the plaintiffs came along in September of 1992, the value had dropped to the point that the defendants agreed to sell property to the plaintiffs at the purchase price of $330,000.

34. However, by the time of the actual closing in 1994, the property value had further dropped, consistent with the prevailing market conditions.

35. Thus, to stem their losses in the property and to circumvent Sanborn's requirement in the commitment letter, that the purchase price in the agreement must conform to the appraised value of the property, the defendants, on or before May 23, 1994, designed, devised and planned a scheme to obtain the full $330,000 for the property, the original purchase price of $330,000.

36. To further this scheme, the defendants drafted a document titled "Amendment to purchase and sale agreement," which was signed by the defendants on May 25, 1994, hereinafter "Amendment Agreement," and demanded the plaintiffs to sign the amendment

8

agreement or vacate the property and forfeit their deposit
payments.


37. A few days before May 23, 1994, Mr. Picard, in order to
further induce the plaintiffs to sign the amendment agreement
told the plaintiff, Mr. Egbarin, that he Mr. Picard knew or was
friends with the appraiser.


38. In this conversation, Mr. Picard went on to say that it was
his agreement with the appraiser that the appraised value of the
property should be set at or below $300,000 so that Mr. Sanborn
could finance the Property, which fell in the category of "jumbo
loan."


39. Mr. Picard further informed Mr. Egbarin that Mr. Sanborn did
not offer mortgages for "jumbo loans," and that any loan over
$300,000 was a jumbo loan.


40. Upon believing these statements made by Mr. Picard on this
date, on or about May 23, 1994 and in reliance on them and, the
plaintiffs' belief that they did not wish to deprive the
defendants of any equity they had in the property, the

plaintiffs signed the amendment agreement under the circumstances and under the threat of losing their deposits.

41. The defendants, through their counsel Lewis LLC and Scott Lewis sent the Amendment agreement by (fax) wire transmission, to the plaintiffs on or about May 23, 1994.

42. The plaintiffs signed the Amendment agreement on May 23, 1994 and returned it by hand delivery to the defendants, Lewis LLC and Scott Lewis.

43. The defendants, Mr. Picard and Mr. Picard signed the Amendment agreement on May 25, 1994 and May 26, 1994 respectively, and the defendants delivered via mail and wire, the fully executed Amendment to Sanborn.

44. Prior to the closing date on May 31, 1994, the defendants, Lewis LLC and Scott Lewis, orally and in writing sent information and documents via telephone wire and regular mail to Sanborn and its Closing counsel, Mayo, Gilligan & Zito.

45. Said information and documents were used in the preparation of the HUD-1 Settlement Statement, hereinafter "HUD-1," as

10

required for such transaction by the U. S. Department of Housing and Urban Development.

46. One of these documents the defendants sent to Sanborn for the closing is a letter which states "Mr. Egbarin has been renting the house on Northcliff Dr. for the past eighteen months. He has paid to us in escrow, the amount of twenty nine thousand, four hundred dollars, from Nov. 1992 through April (sic) 1994[.]"

47. This letter was signed by the Picards and has a faxed date notation on the document, of "May 03, 1994" and "May 06 1994."

48. Said letter was produced by the defendants on January 24, 2001, pursuant to the plaintiffs' request for production in this case.

49. At the closing on May 31, 1994, the defendants were present along with the plaintiff, Mr. Egbarin and counsel from Mayo, Gilligan & Zito who represented the lender, Sanborn and the borrowers, the plaintiffs.

50. The plaintiff, Mrs. Egbarin was not present at said closing.

51. At the closing, the defendants, Lewis LLC and Scott Lewis, presented Mr. Egbarin with documents for a second Mortgage and promissory note for the amount of $30,000.

52. This note and second mortgage for $30,000 represented the amount over and above the purchase price of $300,000 approved by the lender and accepted by the parties.

53. Also, this note and second mortgage were prepared and presented in furtherance of the scheme described above in paragraphs 35 to 39.

54. The said note and mortgage were signed by the parties at the same place and within the same period of time for the closing of the loan from Sanborn.

55. Mrs. Egbarin signed her part at lunchtime on the same day, at the law office of the defendant, Scott Lewis.

56. The defendants did not disclose the existence of the second mortgage and note on the HUD-1 and the defendants, Mr. and Mrs. Picards did not disclose that they were holding an equity

12

interest of $30,000 in the property over and above the $300,000 purchase price stated in the HUD-1.


57. Thus, the defendants violated the instructions issued by the U.S. Department of Housing and Urban Development, 24 CFR Pt 3500 App. A, pages 57-58, for the HUD-1 statement, which require that if a seller takes a note from a buyer, this financing arrangement should be listed on lines 204-209 and in lines 506-509 of the HUD-1.


58. Also, although 18 U.S.C. § 1012 requires the sellers to disclose their interest in the property financed, the defendants, Mr. and Mrs. Picard, did not disclose their equity interest of $30,000, in violation of this statute.


59. Furthermore, as mentioned below, it has been determined by court, in prior proceedings involving Mr. Egbarin and the defendants, that the defendants did not disclose their second mortgage and note in the HUD-1.


60. The HUD-1 was signed by the plaintiffs and Mrs. Picard only, while Mr. Picard was not included as a seller and did not sign,

however, he was present at the closing and negotiated the terms of the transaction.

61. The HUD-1 was accurately prepared and contains the statements, under penalty of perjury, on lines 201 and 506 amongst others, that the plaintiffs "paid deposit money" of "$30,000" towards purchase of the property.

62. Furthermore, the HUD-1 was accurately prepared and contains the statements, under penalty of perjury, that the sellers, Mrs. Picard, received "deposit money" of "$30,000."

63. Furthermore, the HUD-1 was accurately prepared and contains the statements, under penalty of perjury, that the "contract sales price" was "$300,000."

64. Furthermore, the HUD-1 was accurately prepared and contains the statements, under penalty of perjury, that the lender gave a loan in the amount of "$270,000" for the balance of the contract sales price.

65.  A few months after the closing, the plaintiffs refused to pay the monthly amounts allegedly due under the note and second

14

mortgage and the defendants, Mr. and Mrs. Picard began their attempts to collect on the second mortgage and note, through defendants, Lewis LLC and Scott Lewis.

66. On March 17, 1995, the defendants, Lewis LLC and Scott Lewis filed a complaint for the foreclosure of the second mortgage and for other remedies in the Hartford Superior court.

67. In the defendants' collection action, the defendant, Mr. Picard signed and filed an affidavit dated November 22, 1995, falsely stating under oath in paragraph 7, that "Mr. & Mrs. Egbarin did not pay either my wife or myself the sum of $30,000 towards the purchase price of the home. Instead they gave us a Promissory Note which was secured by a second mortgage on the premises."

68. In addition said affidavit dated November 22, 1995 falsely stated in paragraph 8 that "Mr. Egbarin knows that neither he nor his wife ever paid my wife or I the balance of the purchase price in the amount of $30,000."

69. Upon information and belief, the defendants, Lewis LLC and Scott Lewis prepared this false affidavit and filed the original

15

in Hartford Superior court via the U. S mail and sent a copy to the Plaintiffs via U.S. mail.

70. On January 22, 1996, in a hearing in Hartford before Hon. Judge Samuel Freed, Scott Lewis falsely stated to the court that the earnest money deposit that was stated in the HUD-1 represented the promissory note.

71. At said hearing, Scott Lewis specifically told the court that "... there was deposit or earnest money of $30,000 on the RESPA. And that deposit in earnest money was by promissory note, and my clients' affidavit says that."

72. This statement is clearly false because Scott Lewis knew that the deposit money was not by the "promissory note."

73. Earlier, on December 28, 1995, the defendants filed a second action in the New Britain Superior court to collect on the promissory note for $30,000 and sought a prejudgment remedy attachment of assets, other than the property, of the plaintiffs.

16

74. In this second collection action, Scott Lewis then submitted papers and false affidavits in the New Britain court containing the same false statements as in the previous affidavits filed the Hartford court.

75. On the basis of these false affidavits, the New Britain court, on March 24, 1996, granted judgment of attachment "PJR," and froze the plaintiffs' accounts.

76. The PJR judgment was later extended to freeze Mr. Egbarin's law practice, which was primarily involved in personal injury cases and settlements.

77. Upon becoming aware that the plaintiff's law practice had been frozen by the court, most of plaintiff's clients, who the plaintiff was compelled to inform of the status of their personal injury cases, transferred their cases to other attorneys.

78. In addition, plaintiff's referral business dried up as the word got out that the court had impounded Mr. Egbarin's law practice.

79. By August 29, 1997, Mechanics Savings Bank, which acquired the loan from Sanborn, commenced a foreclosure of the property after the plaintiffs were unable to make the mortgage payments.

80. The plaintiffs were unable to make their mortgage payments due to the PJR order freezing the plaintiff's law practice and the resultant demise of the plaintiff's law practice business.

81. In the foreclosure action brought by mechanics bank, the defendants again filed several documents containing the same false statements mentioned earlier, including the false affidavits.

82. On April 24, 1998, the defendants submitted yet another false affidavit in support of a motion for summary judgment in the New Britain matter.

83. In this April 24, 1998 affidavit, Mr. Picard falsely stated that "[the plaintiffs] after being approved by Sanborn for the Mortgage Loan, still needed the sum of $30,000 to purchase the premises from my wife and me for $300,000."

84. Furthermore, in said April 24, 1998 affidavit, Mr. Picard falsely stated that "[the plaintiffs] inquired of my wife and me if they could borrow the sum of $30,000.00 from us."

85. Also, in Said April 24, 1998 affidavit, Mr. Picard falsely stated that, "[o]n may 31, 1994, my wife and I sold and transferred the premises to the [plaintiffs] for the sum of $300,000 of which $270,000.00 came from the [plaintiffs'] loan with Sanborn and $30,000 was by way of the Note with us."

86. This April 24, 1998 affidavit is clearly a false affidavit because the Mr. Picard knew that $30,000 that was the balance for the transaction and which was recorded in the HUD-1, was not by way of the promissory note.

87. This April 24, 1998 false affidavit was submitted to the New Britain Superior court by the defendants, Lewis LLC and Scott Lewis via U.S mail. A copy was mailed to the plaintiffs and plaintiffs' counsel.

88. In or around January 1997, the defendants, Scott Lewis and Mr. Picard, in their continued effort to collect their debt and to put more pressure on the plaintiff to pay the $30,000 debt

19

filed yet another complaint with the Statewide Grievance Committee.

89. In the grievance complaint, the defendants falsely charged Mr. Egbarin with the claim that Mr. Egbarin gave the defendants his 1992 and 1993 tax returns for the purpose of their second mortgage.

90. Furthermore, the defendants also complained that when Mr. Egbarin gave these tax returns to them, he had not filed said tax returns with the IRS or DRS.

91. These charges in the complaint are false because Mr. Egbarin never gave his tax returns to the defendants and Mr. Egbarin's accountant testified that he prepared and filed these tax returns.

92. Furthermore, on March 4, 1999, the defendants, Scott Lewis and Mr. Picard, in their continued effort to collect their debt and to put more pressure on the plaintiff to pay the $30,000 debt which was now a $40,000 judgment debt, testified in the presentment hearing stemming from the grievance complaint.

93. During the presentment hearing, the defendants, Scott Lewis and Mr. Picard testified before Hon. Judge Berger, and gave false testimony as was contained in the false affidavits.

94. After taking testimony and documents, on June 22, 1999, Berger, J., found amongst other things, that "The HUD Settlement Statement for the closing of the house does not refer to this second mortgage or note for $30,000."

95. In addition, Berger, J. also found "that in his [Mr. Picards'] affidavit on the motion for summary judgment ... There is no mention of the $30,000 lease payment credit..." Statewide Grievance Committee v. Egbarin, Superior court, Hartford, Docket No. CV-98-0585474S, (Berger, J.)(June 22, 1999).

96. Arising from this grievance complaint, Mr. Egbarin was suspended from the practice of law for 5 years and consequently disbarred, while the defendants, Scott Lewis and Mr. Picard, between June 1999 and December 2000, continued their efforts to collect their debt and to put more pressure on the plaintiff to pay the $30,000 debt which was now a $40,000 judgment debt.

21

97. In December of 2000, after the plaintiff filed for bankruptcy, Scott Lewis contacted the plaintiffs' bankruptcy counsel, David Azia, and said the defendants would not collect or contest the dischargeability of their debt in the bankruptcy proceeding, if the plaintiffs dropped the pending suit against the defendants.

## V.    CLAIMS.

**FIRST CLAIM: RICO, RACKETEERING INFLUENCED CORRUPT ORGANIZATION.**
98. The allegations in paragraphs 1-97 inclusive are incorporated herein as if fully set forth herein.

99. This claim is pled against all defendants.

100. The defendants, associated together amongst each other in the manner described in this complaint directed the affairs of a racketeering enterprise established for the commission of criminal acts, which acts constitute a pattern of racketeering activity and which pattern of racketeering activity consists of two or more criminal acts committed by the defendants.

22

101. The commission of such criminal acts by the defendants constitutes a violation of the Racketeering Influence and Corrupt Organization Act, 18 U.S.C. § 1962(c).

102. The following criminal violations and predicate acts can be established by undisputed facts as to each defendant:

## A. Mrs. PAULINE M. PICARD

103. On or before May 23, 1994, at the defendants residence and or places of business, and subsequently onto May 31, 1994, at the same places, Mrs. Picard and other defendants designed, planned and executed a scheme to stem their losses in the property and to circumvent Sanborn's requirement that the purchase price in the agreement conform to the appraised value of the property, ultimately to obtain the full sum of $330,000 for the property. This scheme violates 18 U.S.C Section 1344.

104. The amendment agreement, the second mortgage and note, the letter faxed on may 3 or 6, 1994 and other documents submitted for the closing, were drawn up to facilitate the defendants,' including Mrs. Picard's scheme to obtain money from Sanborn, a broker for federal financial institutions, and were sent on multiple days between on or before May 23, 1994 on to and

23