subsequently after May 31, 1994 via US mail to the plaintiffs and the bank in violation of 18 U.S.C. Section 1341 and section 1343.

105. On May 31 1994, at the closing at the law office of Mayo, Gilligan & Zito, Wethersfield, Connecticut, Mrs. Picard did not disclose her $30,000 second mortgage and equity interest in the subject property in violation of 18 U.S.C. Section 1012 and in violation of 18 U.S.C Section 1344.

106. On May 31, 1994, at the closing at the law office of Mayo, Gilligan & Zito, Wethersfield, Connecticut, Mrs. Picard falsely certified that the HUD-1 was true and accurate when in fact it did not contain her $30,000 second mortgage and equity interest in the subject property in violation of 18 U.S.C Section 1344.

107. On December 1, 1995 Mrs. Picard, falsely stated in a sworn affidavit filed in superior courts in Hartford and in New Britain, that the plaintiffs did not pay $30,000 towards the purchase of the subject property and that the plaintiff instead gave a second mortgage, although Mrs. Picard certified to the contrary in the HUD 1, in violation of 18 U.S.C. Section 1503

24

## B. Mr. CLAUDE J. PICARD

108. On May 31 1994, at the closing at the law office of Mayo, Gilligan & Zito, Wethersfield, Connecticut, Mr. Picard did not disclose her $30,000 second mortgage and equity interest in the subject property in violation of 18 U.S.C. Section 1012.

109. On May 31, 1994, at the closing at the law office of Mayo, Gilligan & Zito, Wethersfield, Connecticut, Mr. Picard falsely certified that the HUD-1 was true and accurate when in fact it did not contain her $30,000 second mortgage and equity interest in the subject property in violation of 18 U.S.C Section 1344.

110. On or before May 23, 1994, at the defendants residence and or places of business, and subsequently onto May 31, 1994, at the same places, Mr. Picard and other defendants designed, planned and executed a scheme to stem their losses in the property and to circumvent Sanborn's requirement that the purchase price in the agreement conform to the appraised value of the property, ultimately to obtain the full sum of $330,000 for the property. This scheme violates 18 U.S.C Section 1344.

111. The amendment agreement, the second mortgage and note, the letter faxed on may 3 or 6, 1994 and other documents submitted

25

for the closing, were drawn up to facilitate the defendants', including Mr. Picard's scheme to obtain money from Sanborn, a broker for federal financial institutions, were sent on multiple days between on or before May 23, 1994 on to and subsequently after May 31, 1994 via US mail to the plaintiffs and the bank in violation of 18 U.S.C. Section 1341 and section 1343.

112. On December 1, 1995 Mr. Picard, falsely stated in a sworn affidavit filed in superior courts in Hartford and in New Britain, that the plaintiffs did not pay $30,000 towards the purchase of the subject property and that the plaintiff instead gave a second mortgage, although Mr. Picard certified to the contrary in the HUD-1, in violation of 18 U.S.C Section 1503.

113. In addition, on November 22, 1995, Mr. Picard also falsely stated in a sworn affidavit filed in superior courts in Hartford and in New Britain, that he was a seller of the subject property although the warranty deed and HUD 1 do not include him as a seller or an owner, in violation of 18 U.S.C Section 1503.

114. On the said date, November 22, 1995, Mr. Picard also falsely stated in the same affidavit that plaintiffs did not pay $30,000 towards the purchase price of the subject property and

instead gave a second mortgage although he knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property, in violation of 18 U.S.C Section 1503.

115. On April 24, 1998, Mr. Picard falsely stated in an affidavit filed in the said superior courts that the plaintiffs needed $30,000 to purchase the subject property and that the $30,000 was by way of the note, although he knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property, in violation of 18 U.S.C Section 1503.

116. Although Mr. Picard knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property and that the HUD-1 did not include any loan from the sellers, Mr. Picard, in said April 24, 1998 affidavit, falsely stated that "[the plaintiffs] inquired of my wife and me if they could borrow the sum of $30,000.00 from us." This affidavit violates of 18 U.S.C Section 1503.

117. Furthermore, although Mr. Picard knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property and that the HUD-1 did not include any loan from the sellers, however, in said April 24, 1998 affidavit, Mr. Picard falsely stated that, "[o]n may 31, 1994, my wife and I sold and transferred the premises to the [plaintiffs] for the sum of $300,000 of which $270,000.00 came from the [plaintiffs'] loan with Sanborn and $30,000 was by way of the Note with us." This affidavit violates of 18 U.S.C Section 1503.

## C. SCOTT F. LEWIS

118. On May 31, 1994, at the closing at the law office of Mayo, Gilligan & Zito, Wethersfield, Connecticut, Scott Lewis knew that the HUD 1 did not disclose the $30,000 second mortgage and equity interest of the Mr. or Mrs. Picard although he prepared the papers for the second mortgage and promissory note and presented these papers to the plaintiffs.

119. On May 31, 1994, at the closing at the law office of Mayo, Gilligan & Zito, Wethersfield, Connecticut, Scott Lewis knew that Mrs. Picard's sworn statement in the HUD-1 was not true and accurate, in that she was holding $30,000 in second mortgage and

28

equity interest and was concealing this information from Sanborn, a broker for federal financial institutions.

120. On or before May 23, 1994, at their residences and or said places of business and subsequently onto May 31, 1994, S. Lewis and other defendants designed, planned and executed a scheme to stem their losses in the property and to circumvent Sanborn's requirement that the purchase price in the agreement conform to the appraised value of the property, ultimately to obtain the full sum of $330,000 for the property. This scheme violates 18 U.S.C Section 1344.

121. The amendment agreement, the second mortgage and note, the letter faxed on may 3 or 6, 1994 and other documents submitted for the closing, were drawn up to facilitate the defendants', including Scott Lewis's scheme to obtain money from Sanborn, a broker for federal financial institutions, were sent on multiple days between on or before May 23, 1994 on to and subsequently after May 31, 1994 via US mail to the plaintiffs and the bank in violation of 18 U.S.C. Section 1341.

122. On November 22, 1995, S. Lewis, at his place of business in west Hartford Connecticut, prepared and filed with the Hartford

superior court, the false affidavit of Mr. Picard containing false statements of material fact which he knew to be false in that Mr. Picard was a seller of the property, although Scott Lewis knew that in the HUD-1 and the warranty deed for the property, Scott Lewis did not include Mr. Picard as a seller of the property in violation of 18 U.S.C. Section 1341 and 15 U.S.C Section 1503.

123. This same affidavit of November 22, 1995, prepared and filed with the Hartford superior court, also contains false statements of material fact which Scott Lewis knew to be false in that the plaintiffs did not pay $30,000 towards the purchase price and instead gave a second mortgage, although Scott Lewis knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property in violation of 18 U.S.C. Section 1341 and 15 U.S.C Section 1503.

124. On December 1, 1995, Scott Lewis prepared at his said place of business and filed with the New Britain superior court, affidavit of Mrs. Picard containing false statement of material fact he knew to be false, in that the plaintiffs did not pay $30,000 towards the purchase price and instead gave a second

mortgage although Scott Lewis knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property, in violation of 18 U.S.C. Section 1341 and 15 U.S.C Section 1503.

125. On January 22, 1996, S. Lewis falsely represented to Hartford superior court that the RESPA indicates there was deposit or earnest money of $30,000 and that deposit in earnest money was by promissory note although he knew that the RESPA (HUD 1) did not in fact indicate that the $30,000 was by promissory note, although Scott Lewis knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property, in violation of 18 U.S.C. Section 1341 and 15 U.S.C Section 1503.

126. On November 10, 1997, S. Lewis prepared at his said place of business and filed special defense in the Hartford and New Britain superior courts, containing false allegations he knew to be false as to the plaintiffs needing $30,000 to purchase the subject property in addition to the lenders mortgage loan, although Scott Lewis knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property and there was no

second mortgage included, in violation of 18 U.S.C. Section 1341 and 15 U.S.C Section 1503.

127. On April 24, 1998, S. Lewis prepared at his said place of business and filed with the New Britain superior court, false affidavit that Mr. Picard was a seller of the subject property although the warranty deed and HUD 1 do not include him as a seller or an owner, in violation of 18 U.S.C. Section 1341 and 15 U.S.C Section 1503.

128. The same affidavit of April 24, 1998, S. Lewis prepared and filed with the New Britain superior court, was also false in that plaintiffs did not pay $30,000 towards the purchase price of the subject property and instead gave a second mortgage although Scott Lewis knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property, in violation of 18 U.S.C. Section 1341 and 15 U.S.C Section 1503.

**D. LEWIS, LEWIS & FERRARO LLC**

129. On May 31, 1994, at the closing at the law office of Mayo, Gilligan & Zito, Wethersfield, Connecticut, Lewis LLC, through its principals, agents, employees and servants, Scott Lewis and

others, knew that the HUD 1 did not disclose the $30,000 second mortgage and equity interest of the Mr. or Mrs. Picard although he prepared the papers for the second mortgage and promissory note and presented these papers to the plaintiffs.

130. On May 31, 1994, at the closing at the law office of Mayo, Gilligan & Zito, Wethersfield, Connecticut, Lewis LLC, through its principals, agents, employees and servants, Scott Lewis and others, knew that Mrs. Picard's sworn statement in the HUD-1 was not true and accurate, in that she was holding $30,000 in second mortgage and equity interest and was concealing this information from Sanborn, a broker for federal financial institutions.

131. On or before May 23, 1994, at their residences and or said places of business and subsequently onto May 31, 1994, Lewis LLC, through its principals, agents, employees and servants, Scott Lewis and others and, other defendants designed, planned and executed a scheme to stem their losses in the property and to circumvent Sanborn's requirement that the purchase price in the agreement conform to the appraised value of the property, ultimately to obtain the full sum of $330,000 for the property. This scheme violates 18 U.S.C Section 1344.

132. The amendment agreement, the second mortgage and note, the letter faxed on may 3 or 6, 1994 and other documents submitted for the closing, were drawn up to facilitate the defendants', including Lewis LLC's scheme to obtain money from Sanborn, a broker for federal financial institutions, were sent on multiple days between on or before May 23, 1994 on to and subsequently after May 31, 1994 via US mail to the plaintiffs and the bank in violation of 18 U.S.C. Section 1341.

133. On November 22, 1995, Lewis LLC, through its principals, agents, employees and servants, Scott Lewis and others, at his place of business in west Hartford Connecticut, prepared and filed with the Hartford superior court, the false affidavit of Mr. Picard containing false statements of material fact which he knew to be false in that Mr. Picard was a seller of the property, although Scott Lewis knew that in the HUD-1 and the warranty deed for the property, Scott Lewis did not include Mr. Picard as a seller of the property in violation 18 U.S.C Section 1503 and 18 U.S.C. Section 1341.

134. This same affidavit of November 22, 1995, prepared and filed with the Hartford superior court, also contains false statements of material fact which Lewis LLC knew to be false in

that the plaintiffs did not pay $30,000 towards the purchase price and instead gave a second mortgage, although Scott Lewis knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property in violation 18 U.S.C Section 1503 and 18 U.S.C. Section 1341.

135. On December 1, 1995, Lewis LLC, through its principals, agents, employees and servants, Scott Lewis and others, prepared at his said place of business and filed with the New Britain superior court, affidavit of Mrs. Picard containing false statement of material fact he knew to be false, in that the plaintiffs did not pay $30,000 towards the purchase price and instead gave a second mortgage although Scott Lewis knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property in violation 18 U.S.C Section 1503 and 18 U.S.C. Section 1341.

136. On January 22, 1996, Lewis LLC, through its principals, agents, employees and servants, Scott Lewis and others falsely represented to Hartford superior court that the RESPA indicates there was deposit or earnest money of $30,000 and that deposit

35

in earnest money was by promissory note although he knew that the RESPA (HUD 1) did not in fact indicate that the $30,000 was by promissory note, although Scott Lewis knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property in violation 18 U.S.C Section 1503 and 18 U.S.C. Section 1341.

137. On November 10, 1997, Lewis LLC, through its principals, agents, employees and servants, Scott Lewis and others prepared at his said place of business and filed special defense in the Hartford and New Britain superior courts, containing false allegations he knew to be false as to the plaintiffs needing $30,000 to purchase the subject property in addition to the lenders mortgage loan, although Scott Lewis knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property and there was no second mortgage included in violation 18 U.S.C Section 1503 and 18 U.S.C. Section 1341.

138. On April 24, 1998, Lewis LLC, through its principals, agents, employees and servants, Scott Lewis and others prepared at his said place of business and filed with the New Britain superior court, false affidavit that Mr. Picard was a seller of

the subject property although the warranty deed and HUD 1 do not include him as a seller or an owner in violation 18 U.S.C Section 1503 and 18 U.S.C. Section 1341.

139. The same affidavit of April 24, 1998, Lewis LLC, through its principals, agents, employees and servants, Scott Lewis and others, prepared and filed with the New Britain superior court, was also false in that plaintiffs did not pay $30,000 towards the purchase price of the subject property and instead gave a second mortgage although Scott Lewis knew that in the HUD-1, Mrs. Picard stated under penalty of perjury that the plaintiffs paid her $30,000 toward the purchase price of the property in violation 18 U.S.C Section 1503 and 18 U.S.C. Section 1341.

140. The predicate acts described hereinabove of the defendants as aforesaid repeatedly violated the provisions of 18 U.S.C. § 1341, in that the defendants, having devised schemes to defraud the plaintiffs and a federally regulated financial institution and to obtain funds by false pretenses, repeatedly caused to be placed in authorized depositories for mail to be delivered by the U.S Post Office and received there-from, various documents and things;

141. The predicate acts described hereinabove of the defendants as aforesaid repeatedly violated the provisions of 18 U.S.C. § 1343, in that the defendants, having devised schemes to defraud the plaintiffs and a federally regulated financial institution and obtain funds by false or fraudulent pretenses, repeatedly caused to be transmitted by telephone lines both verbally and digitally, sounds and signals in interstate commerce;

142. The predicate acts described hereinabove of the defendants as aforesaid repeatedly violated the provisions of 18 U.S.C. § 1344, in that the defendants knowingly executed schemes on dates and in the manner set forth hereinabove, to obtain funds from the plaintiffs and a federally regulated financial institution by false and fraudulent pretenses.

143. The predicate acts described hereinabove of the defendants as aforesaid repeatedly violated the provisions of 18 U.S.C. § 1503, in that the defendants knowingly devised and executed schemes on dates and in manner set forth hereinabove, to obtain funds from plaintiffs by false and fraudulent pretenses and in obstruction of justice.

144. The acts of the defendants constitute racketeering activity, adversely affecting interstate commerce, and constitute violations of 18 U.S.C. § 1962(c).

145. The acts of the defendants' criminal enterprise, as hereinabove described, adversely affected interstate commerce in that among other things, documents containing misrepresentations and non-disclosures were actually delivered or transferred by telephone wire and or mailed to a federally regulated financial institution involved in interstate commerce.

146. The acts of the defendants, as hereinabove described, constitute a threat of continued racketeering activity and are, in fact, ongoing and or constitute repeated instances of racketeering activity within a defined period of time.

147. Such acts of the defendants, as aforesaid, individually and in concert, have caused injury to the plaintiffs'' property and to Mr. Egbarin's business in an amount not presently capable of precise ascertainment, but which is estimated to be approximately $155,000 in plaintiffs'' property and $10,700,000 in Mr. Egbarin's business.

148. Additionally, plaintiffs are entitled to recover three-fold such damages, together with reasonable attorneys'' fees incurred by plaintiffs and the costs and taxable disbursements of this action.

**SECOND CLAIM: FDCPA, FAIR DEBT COLLECTION PRACTICES ACT**

149. The allegations in paragraphs 1-97 and 102-139 inclusive are incorporated herein as if fully set forth herein.

150. This claim is pled against the defendants, Scott Lewis and Lewis LLC.

151. The actions of the defendants Lewis LLC and Scott Lewis, as hereinabove described, constitute repeated misrepresentations of material facts, or non-disclosure of necessary information, and were in fact, continuing and fraudulently concealed, all of which were intentionally engaged in or used to collect or attempt to collect the debt mentioned hereinabove, in violation of 15 U.S.C. § 1692e.

152. Furthermore, the actions of the defendants, Lewis LLC and Scott Lewis as hereinabove described constitute harassment, oppression and abuse of the plaintiffs, and are in fact

continuing and fraudulently concealed, more particularly targeted against Mr. Egbarin, in violation of 15 U.S.C § 1692d(2).

153. As a result of the false, deceptive and misleading representations of the defendants, Lewis LLC and Scott Lewis, in the collection of the debt, all of which are hereinabove described, the plaintiffs have been caused injury in their property and the business of Mr. Egbarin in a sum not presently capable of precise ascertainment, but which sum is estimated to be approximately $155,000 in plaintiffs' property and $10,700,000 in Mr. Egbarin's business.

154. Additionally, as a result of the defendants, Lewis LLC' and Scott Lewis' violation of the fair debt collection practices Act, as hereinabove described, the plaintiffs have been caused and suffered intense and prolong emotional distress, mental anguish and distress in a sum which is presently not capable of precise ascertainment, but which sum is estimated to be approximately $5,000,000 for Mrs. Egbarin and $5,000,000 for Mr. Egbarin.

155. Additionally, the plaintiffs are entitled to recover from Lewis LLC and Scott Lewis, statutory damages, reasonable

attorneys'' fees incurred by the plaintiffs and the costs and taxable disbursements for this action.

**THIRD CLAIM: FRAUD**

156. The allegations in paragraphs 1-97 and 102-139 inclusive are incorporated herein as if fully set forth herein.

157. This claim is pled against all defendants.

158. The actions of the defendants, as hereinabove described, constitute repeated misrepresentations of material fact, and or non-disclosure of necessary information, and were in fact, continuing and fraudulently concealed, all of which were intentionally engaged in by the defendants for their personal gain.

159. The defendants obtained several court judgments to the detriment of the plaintiffs, upon the misrepresentations of material fact and or non-disclosure by the defendants that were made to induce the reliance by the courts and the plaintiffs.

160. As a result of the misrepresentations and non-disclosure by the defendants, as hereinabove described, the plaintiffs have

been caused injury in their property and business in a sum not presently capable of precise ascertainment, but which is estimated to be approximately, $155,000 in the plaintiffs'' property and $10,700,000 in Mr. Egbarin's business.

161. Additionally, the plaintiffs are entitled to an award of punitive damages, in an amount deemed reasonable by the trier of fact so as to discourage others, who may be similarly prompted, from engaging in conduct similar to that described herein.

**FOURTH CLAIM: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

162. The allegations in paragraphs 1-97 inclusive are incorporated herein as if fully set forth herein.

163. This claim is pled against all defendants.

164. The actions of the defendants, as hereinabove described were intentionally engaged in to inflict pain, mental anguish and emotional distress upon the plaintiffs.

165. As a result of the defendants' wrongful conduct of intentional infliction of emotional distress and mental anguish, the plaintiffs have been caused to suffer and did suffer intense