UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NITOR V. EGBARIN and | : | CIVIL ACTION |
| JANET J. EGBARIN | | NO. 3:00-CV-1043-JCH |
|       Plaintiffs, | | |
| V. | : | |
| | | |
| LEWIS, LEWIS & FERRARO, LLC | : | |
| SCOTT F. LEWIS, CLAUDE J. PICARD | | |
| AND PAULINE M. PICARD | | |
|       Defendants. | : | MAY 27, 2005 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS CLAUDE J. AND PAULINE M. PICARDS' MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Pursuant to Rule 56 of the Federal and Local Rules of Civil Procedure, the defendants Claude J. and Pauline M. Picard submit this memorandum of law in support of their Motion for Summary Judgment on the July 26, 2004 Amended Complaint. In further support of their motion, they have submitted a Local Rule 56(a)1 statement of undisputed facts and, in the interest of judicial economy, incorporate by reference the Affidavit of Scott Lewis and the Appendix of Exhibits attached to the remaining Defendant's Motion for Summary Judgment. For the reasons set forth below, the Court should grant the defendants' motion.

## BACKGROUND

I.    STATEMENT OF FACTS

The plaintiffs, Nitor and Janet Egbarin, have commenced this action against

Lewis, Lewis & Ferraro, LLC, Scott F. Lewis, Claude J. Picard and Pauline M. Picard

seeking compensation related to a real estate transaction and subsequent lawsuits related

thereto.  (See generally First. Am. Compl.)

On or about September 16, 1992, the plaintiffs entered into an agreement entitled

"Purchase, Sale and Lease Agreement" with the defendants for the lease and ultimate

purchase of 8 North Cliff Drive in Bloomfield, Connecticut.  (Id. at ¶ 14).  This

agreement set a purchase price of $330,000 and an October 1, 1993 closing date, with a

right to an extension until April 1, 1994.  (Id. at ¶ 15).  Prior to the closing, the plaintiffs

were to occupy the premises and pay the codefendants a $2,100 monthly lease payment,

$500 of which would be credited toward a deposit or down payment on the purchase

price.  (Id. at ¶ 16).  In addition, the plaintiffs were to pay an additional $10,000 toward

the down payment.  (Id. at ¶ 17).  The contract also provided that only the $10,000 would

be refunded if the plaintiffs were unable to purchase the property for any reason, including the failure to obtain a mortgage.  (Id. at ¶ 18).[1]

On or about May 23, 1994, the plaintiffs and defendants entered into a second agreement entitled "Amendment to Purchase and Sale Agreement" in which the purchase price was adjusted to $300,000 and which also provided that none of the deposit money paid as of that date (approximately $25,000) would be applied toward the sales price. (Ex. A, Lewis Aff., ¶ 20).  Scott Lewis, codefendant who represented the defendants in relation to the real estate transaction and subsequent lawsuits, drafted this second agreement.  (Id. at ¶ 21).

The amended agreement was necessary because the mortgage company from which the plaintiffs were attempting to secure a loan appraised the property at $300,000. (Id. at ¶ 22).  Thus, the company would not approve the mortgage unless the purchase price was $300,000.  (Id. at ¶ 23).  Mr. Picard, however, was unwilling to reduce the purchase price but agreed to renegotiate the deal such that the price was reduced to $300,000, but the plaintiffs would not receive credit for or a refund of the previous down payment.  (Id. at ¶ 24).  The  Picards and the plaintiffs signed this agreement, which superceded the earlier agreement and the plaintiffs thereafter obtained a $270,000

---

[1] See also September 16, 1992 "Purchase, Sale and Lease Agreement" attached hereto as Exhibit B.

mortgage through Sanborn Corporation.  (Id. at ¶ 25). [2] The plaintiffs did not have the

additional $30,000 to complete the sale and thus, an additional agreement was reached

whereby the Picards would take back a promissory note and a second mortgage in that

amount.  (Ex. A. Lewis Aff., ¶ 27).  Scott Lewis drafted the note which was executed at

the closing on or about May 31, 1994.  (Id. at ¶ 28).[3]

    The plaintiffs thereafter failed to make the required payments on the note.  (Ex. A,

Lewis Aff., ¶ 30).  Thus, in March, 1995, the undersigned defendants instituted a

foreclosure action in the Hartford Superior Court.  (Id. at ¶ 31).  They subsequently filed

a second lawsuit in December 1995 in the New Britain Superior Court.  (Id. at ¶ 32).  The

second action was a suit on the note which ultimately resulted in a judgment against the

Egbarins in July 1998.  (Id. at ¶ 33).  The original foreclosure action in the Hartford

Superior Court was withdrawn.  (Id. at ¶ 34).

    In defending the two lawsuits, the Egbarins attempted to circumvent the portion

of the amended agreement which stated that the Picards were entitled to keep the

previously paid deposits and that they would not be credited toward the purchase price by

virtue of a clerical error in the "Settlement Statement" (also known as the HUD-1).  (Id.

at ¶ 35).  Specifically, while that statement correctly showed the contract price to be

---

[2] See also May 23, 2994 "Amendment to Purchase and Sale Agreement" attached hereto has Exhibit C.
[3] See also copy of executed note attached hereto as Exhibit D.

$300,000 and a first mortgage of $270,000, it also showed, in error, "deposit or earnest money" of $30,000. (Id. at ¶ 36). In fact, the settlement statement should have reflected a second mortgage of $30,000. (Id. at ¶ 37). This error apparently resulted from an oversight on the part of the bank's attorneys who prepared the statement. The undersigned had nothing to do with the preparation of the document and did not notice the error at closing. (Id. at ¶ 38). There was no effort to mislead the bank and, in fact, the bank, despite the error, was fully aware of the second mortgage and therefore knew that the loan was 100 percent financed. (Id. at ¶ 39). Specifically, a copy of the bank's file, which was subpoenaed in one of the previous lawsuits, included a copy of the $30,000 promissory note. (Id.). In addition, it is undisputed that Nitor Egbarin himself avised the bank regarding the second mortgage and note prior to the closing. See Statement of Undisputed Facts, ¶ 29.

Nonetheless, the plaintiffs advanced the above-stated defenses relative to the suits on the note. (Id. at ¶ 25). Specifically, they attempted to claim in defending the previous lawsuits that the HUD Settlement Statement was evidence that they had, in fact, paid $30,000 as a deposit and that there was no valid promissory note or second mortgage. Ex. A, Lewis Aff. at ¶ 40. In doing so, they challenged the veracity of all of the defendants with respect to statements made in court and affidavits submitted thereto. Ex. A., Lewis Aff. at ¶ 41; Statement of Undisputed Facts, ¶ 40. They specially pleaded

fraud and misrepresentation, as well.  See Statement of Undisputed Facts, ¶ ¶ 25, 37.

They also asserted a counterclaim on grounds of alleged fraud and misrepresentation.  Id.

In fact, Mr. Egbarin referenced his special defenses on many occasions during the course

of his 12/8/95 deposition relative to the first Picard v. Egbarin matter.  See Statement of

Undisputed Facts, ¶ 39.  Further, both he and his attorney accused the Picards and Mr.

Lewis of fraud and misrepresentation relative to the real estate transaction on several

occasions during the deposition and thereafter.  Id. at ¶ ¶  39, 40.  These defenses and

challenges were thereby adjudicated and ultimately rejected by virtue of the judgment

entered against the Egbarins.  Ex. A, Lewis Aff. at ¶ 42.

     In the course of conducting discovery in the previous lawsuit, the undersigned

discovered that the income tax returns the plaintiffs produced to both his clients and the

financial institutions were fraudulent in that they were never filed with the IRS.  (Id. at ¶

44)[4] In other words, the plaintiffs had used false tax returns in order to secure their loans.

---

[4] Despite the plaintiffs' claims in his First Amended Complaint that he never provided the defendants with these tax returns and that they were in fact filed  (See ¶¶ 88-91), he testified to the contrary during the presentment hearing while under oath.  See Statewide Grievance Committee v. Nitor Egbarin,  61 Conn. App. 445, 449-50, cert. denied, 225 Conn. 949 (2001). ("At the hearing, the defendant also testified and stated before the trial court that at the time of the property closing in 1994, his taxes were not paid in full because of a personal arrangement with the Internal Revenue Service (IRS).  When the court asked the defendant about the details of his arrangement with the IRS, the defendant avoided answering the question and failed to provide the court with any information or details.  The defendant further revealed to the court that he also failed to pay his 1994 taxes.")  See also Id. at 454 ("The court found that there was clear and convincing evidence demonstrating that the defendant misrepresented relevant facts to

After consulting with the codefendants, the undersigned filed a grievance complaint against the plaintiff, Nitor Egbarin, who had been a licensed, practicing attorney at the time.  (Id. at ¶ 45).  This complaint ultimately resulted in Mr. Egbarin's disbarment.  (Id. at ¶ 46).

The codefendant, Lewis, Lewis & Ferraro, LLC is a small, West Hartford based law firm.  (Id. at ¶ 44)  Both the firm and Attorney Lewis specialize in personal injury litigation, divorce and family law, wills, probate and elder law, bankruptcy and real estate.  (Id. at ¶¶ 7, 9) The firm and Attorney Lewis, one of its members, do not specialize in, nor do they routinely practice, debt collection.  (Id. at ¶ 10).   To the extent the plaintiffs' characterizations of the underlying lawsuits as debt collection can even be given any credence, they were merely incidental to the real estate transaction at issue. (Id. at ¶43).

## II.    THE PLAINTIFFS' CLAIMS

The First Amended Complaint contains seven "claims" or counts.  The first count, entitled "RICO, Racketeering Influenced Corrupt Organization" alleges that, in relation to the aforementioned transaction and/or subsequent lawsuits, "[t]he defendants, associated together amongst each other in the manner described in this complaint directed the affairs of a racketeering enterprise established for the commission of

---

Sanborn and to the Picards by submitting his federal income tax returns without disclosing that he did not pay his income taxes . . . .")

criminal acts, which acts constitute a pattern of racketeering activity and which pattern of racketeering activity consists of two or more criminal acts committed by the defendants" in violation of 18 U.S.C. § 1962(c ).  (First Am. Compl., First Count, ¶¶ 100-101).

The second count, entitled "FDCPA, Fair Debt Collection Practices Act" alleges that the codefendants, the Lewis defendants, misrepresented material facts or failed to disclose necessary information in an effort to collect a debt in violation of 15 U.S.C. § 1692.  (First Am. Compl., Second Count, ¶¶ 150-152).

The third count, entitled "fraud", alleges that the defendants committed fraud through misrepresentations of material fact and/or nondisclosure, thereby obtaining state court judgments against the plaintiffs.  (First Am. Compl., Third Count, ¶¶ 158-159).

The fourth count, entitled "intentional infliction of emotional distress," alleges that certain claimed acts of the defendants "were intentionally engaged in to inflict pain, mental anguish and emotional distress upon the plaintiffs."  (First Am. Compl., Fourth Count, ¶ 164).

The fifth count, entitled "negligent infliction of emotional distress," alleges that certain claimed acts of the defendants "negligently inflicted pain, mental anguish and emotional distress upon the plaintiffs."  (First Am. Compl, Fifth Count, ¶

168).[5]

The sixth count, entitled "tortious interference with business expectancy," alleges that the defendants tortiously interfered with the plaintiff's law practice thereby causing its demise and total destruction.  (First Am. Compl., Sixth Count, ¶ 172).

The seventh count, entitled "CUTPA, Connecticut Unfair Trade Practices Act," alleges that certain claimed acts of the defendants were "fraudulent, immoral, unethical, oppressive or unscrupulous" and thereby violated Conn. Gen. Stat. § 42-110b (CUTPA). (First Am. Compl., Seventh Count, ¶¶178-179).

## STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(b).  See Szekeres v. Schaeffer, 304 F. Supp. 2d 296, 304 (D. Conn. 2004).  A genuine issue of fact only exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to

---

[5] It is important to note that the fifth, sixth and seventh counts of the First Amended Complaint constitute newly alleged causes of action.  The original Complaint, dated May 23, 2000, did not include claims for negligent infliction of emotional distress, tortious interference with business or CUTPA.

the outcome if the substantive law renders them so.  Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 251-52 (1986).  If the moving party carries his burden, the party opposing
summary judgment "may not rest upon mere allegations or denials," rather the opposing
party must "set forth specific facts showing that there is a genuine issue for trial."  Fed.
R. Civ. P. 56(e).  Thus, to defeat a motion for summary judgment, the nonmoving party
"must do more than simply show that there is some metaphysical doubt as to the material
facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "If
the evidence is merely colorable, or is not significantly probative, summary judgment
may be granted."  Anderson, 477 U.S. at 249-50.

**ARGUMENT**

**I.      RICO**

**A.      The Plaintiffs' RICO Claim Fails to State a Claim Upon Which Relief Can
Be Granted**

A civil RICO (18 U.S.C. §§ 1961-1968) action may be brought by a private
plaintiff where the statutes' substantive provisions have been violated.  Sedima v.
IMREX, 105 S. Ct. 3275, 3278 (1985).  These provisions are very involved and stringent,
however, and proof that they have been violated is necessarily difficult to achieve. In
Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998), for example, the
District Court aptly observed that:

> In considering RICO claims, courts must attempt to achieve goals consistent with Congress's goal of protecting legitimate businesses from infiltration by organized crime. As one district court within this Circuit has stated Civil RICO is an unusually potent weapon – the litigation equivalent of a thermonuclear device. Because the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants . . . , courts should strive to flush out frivolous RICO allegations at an early stage of the     litigation.  To this end, a court's focus must be to ensure that RICO's severe penalties are limited to enterprises consisting of more than simple conspiracies to perpetuate the acts of racketeering. Thus courts must always be on the lookout for        the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.

(internal quotations and citations omitted).  See also O'Malley v. NYC Transit Authority, 896 F.2d 704, 705 (2d. Cir. 1990) (plaintiff's RICO claim was nothing more than 'a simple claim made by an employee that he was wrongfully terminated.').  In sum, RICO was intended to target ongoing criminal enterprises and was not intended to create a federal remedy for garden variety state law fraud claims such as those alleged here.

The plaintiffs' claim is based upon a purported violation of 18 U.S.C. 1962 (c ) which provides that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly, or

indirectly, in the conduct of such enterprise's affairs
through a pattern of racketeering activity or collection
of unlawful debt.

It is clear that the plaintiffs' assertion that "[t]he defendants, associated together amongst

each other in the manner described in this complaint directed the affairs of a racketeering

enterprise established for the commission of criminal acts, which acts constitute a pattern

of racketeering activity and which pattern of racketeering activity consists of two or more

criminal acts committed by the defendants" amounts to nothing more than a bald legal

conclusion and is thus insufficient when properly analyzed under RICO's stringent

pleading and proof requirements.  Specifically, in order to successfully make a claim for

a civil RICO violation under § 1962 (c ), plaintiffs must plead and prove conduct (1) of

an enterprise (2) through a pattern of racketeering activity.  <u>Viacom v. Harbridge</u>, 20

F.3d 771, 778 (1994).  The plaintiffs here have not accomplished this, nor can they.  As

such, the defendants are entitled to judgment as a matter of law with respect to the RICO

claims.

### 1)    Enterprise

Enterprise is defined in § 1961(4) as including "any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals

associated in fact although not a legal entity."  "In interpreting this statute, the Supreme

Court has defined a RICO enterprise 'as a group of persons associated together for a

common purpose of engaging in a common cause of conduct.'" <u>Schmidt</u>, 16 F. Supp. 2d a t 349 (citation omitted).  "The existence of a RICO enterprise is 'proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" <u>Id.</u>  (citation omitted).

In this case, the plaintiffs presumably are claiming that the Picard defendants and the Lewis defendants operated as an "association-in-fact."  In determining whether the members of a purported association-in-fact functioned as a unit, the "courts in the Second Circuit must look to the 'hierarchy, organization, and activities' of the association."  <u>First Nationwide Bank v. Gelt Funding Corp.</u>, 820 F.Supp. 89, 98 (S.D.N.Y. 1993) <u>aff'd.</u> 27 F.3d 763 (2d Cir. 1994).  In applying all of these standards to the allegations of the complaint and the undisputed facts of this case as they apply to the defendants, it is clear that the plaintiffs have not, nor can they, prove the existence of a RICO enterprise.  To the contrary, there is no issue of fact with regard to the conclusion that there was no RICO enterprise.

The plaintiffs have not even attempted to describe the "hierarchy, organization or activities" of the enterprise in their complaint, and even if they had, no facts would support such a conclusion. The substantive allegations of the complaint are, to say the least, unclear as to the nature of the alleged misconduct of the defendants.  At most the plaintiffs seem to claim that the defendants acted in concert to cause them to sign a

$30,000 promissory note in connection with the purchase of residential real estate and to then obtain a judgment on the note.  This is despite the undisputed fact that the plaintiffs readily agreed to the note and second mortgage and in fact declined to have it reviewed by their attorney.  <u>See</u>  Statement of Undisputed Facts, ¶ 20.  Further, had the plaintiffs not defaulted in their obligations under the note, there would have been no need for the subsequent lawsuits and judgments.  The defendants certainly were in no position to know at the time the note was executed that the plaintiffs would shirk their financial responsibility thereby necessitating follow-up legal action.  There are, therefore, no facts to support the plaintiffs' claims here.  Even if there were, they would not rise to the level of an "enterprise" existing independently of the alleged acts of misconduct.

### 2)    Pattern of Racketeering Activity

The plaintiffs also have the burden of proving facts which support the finding of a "pattern of racketeering" i.e., at least two criminal acts of racketeering (as defined in § 1961(1)) within a two year period.  18 U.S.C. § 1961(5).  The plaintiffs must prove the essential elements of these so-called "predicate acts" or "offenses" in order to withstand a motion for summary judgment.  Here, the plaintiffs' RICO claims against the undersigned defendants are predicated on alleged violations of 18 USC § 1341 (mail fraud), 18 USC § 1343 (wire fraud), 18 USC §1344 (bank fraud) and 18 USC §1503

(obstruction of justice).[6]  The plaintiffs have not, nor can they, however, sustain their

burden of proving any of these alleged violations.

a)    **18 U.S.C. §§1341 and 1343 (mail fraud and wire fraud)**

To prove mail and wire fraud, the plaintiffs must establish (1) the existence of a

scheme to defraud (2) the defendants' knowing and willing participation in the scheme,

and (3) the use of interstate mails or transmission facilities in furtherance of the scheme.

Bernstein v. Misk, 948 F. Supp. 228, 238 (E.D.N.Y. 1997).  Further, proof of mail fraud

requires the plaintiffs to identify "the content of the items marked and specify how each

of the items was false and misleading.  Id. at 239. There is a similar burden with respect

to wire fraud.  Id. at 245.  Further, wire fraud requires proof of interstate wire

transmissions; intrastate wire transmissions are insufficient.  Neder v. United States, 119

S.Ct. 1827, 1839 (1999).

A scheme to defraud under the mail and wire fraud statutes involves the use of

"dishonest methods or schemes and usually signifies the deprivation of something of

value by trick, deceit, chicane or overreaching."  McNally v. United States, 107 S.Ct.

---

[6] It is important to note that the plaintiffs have specifically charged the codefendants with violating
18 U.S.C. § 1012 (Department of Housing and Urban Development Transactions) as a predicate
offense under RICO.  Although they have not done so specifically against the undersigned, they
do charge the undersigned with knowledge of the alleged problems giving rise to their §1012
claim.  18 U.S.C. § 1012 , however, is not included on the exhaustive list of predicate offenses
under RICO and thus alleged violations thereof cannot form the basis for the plaintiffs' claims in
this regard.  Miranda v. Ponce Federal Bank, 948 F.2d 41, 48 (1st Cir. 1991).

2875, 2881 (1987).  Further, the scheme must be predicated upon misrepresentations or

omissions which are reasonably calculated to deceive persons of ordinary intelligence.

Walters v. First Tennessee Bank N.A., 855 F.2d 267, 273 (6th Cir. 1988) cert. denied 109

S.Ct. 1344 (1989).  Misconduct which does not involve deceit of the plaintiff does not

amount to mail or wire fraud.  Central Distributors of Beer, Inc. v. Conn., 5 F.3d 181,

184 (6th Cir. 1993) cert. denied 114 S.Ct. 2678 (1994).

     The plaintiffs have not, nor can they, prove any specific facts to support their

claim of mail or wire fraud.  Despite the unfounded innuendo regarding a "scheme" to

defraud, the undisputed facts clearly demonstrate nothing more than a real estate

transaction involving the plaintiffs and the defendants wherein the plaintiffs clearly

agreed to the terms and conditions of an agreement which they are now attempting to

characterize as a "scheme to defraud."  A review of all of the pertinent paperwork and the

undisputed facts reveals nothing more than an inconsequential error, committed by the

bank's attorneys (who are not parties to this action), regarding the existence of the second

mortgage to which the plaintiffs agreed and about which the bank was aware.  In this

regard, there is no dispute that the plaintiff himself advised the bank about the second

mortgage and note prior to the closing.  Further, the bank's file, retrieved under subpoena

in 1995, included a copy of the second mortgage/promissory note.  Thus, although there

was an error in the HUD-1 form, there certainly was nothing false or misleading about it

because all of the relevant parties to the transaction possessed the knowledge to ascertain the error.

Even if this were not the case, and the plaintiff did not advise the bank regarding the note and the bank's file did not include the note, the fact remains that the plaintiff was not and could not be damaged as a result of the clerical error.  Rather, the HUD-1 form exists for the benefit of and to protect lending institutions and thus, only the bank would have standing to claim a violation of this statute because only the bank could be damaged as a result.  Indeed, this is precisely the opinion offered by Laura Borelli, the plaintiffs' own expert in this regard.  See Borelli dep. Pp. 46-52.  (Attached hereto as Ex. E).  Specifically, Ms. Borelli opined that the plaintiff was complicit in preparing the HUD-1 incorrectly and that she evaluated damages from the perspective of the lender.  Id.

Further, this so-called "scheme" defense was already raised by the plaintiffs and rejected by the Connecticut Superior Court in the action on the note.  See e.g.  Sundwall v. Reiner & Reiner, 1997 WL 117286 (D. Conn.) (defining doctrines of res judicata and collateral estoppel, as discussed in more detail, infra).  (Sundwall attached hereto as Exhibit I).

Finally, the plaintiffs have not, nor can they, prove any interstate use of wire communication, fax or telephone.  The plaintiffs and the bank are and were domiciled in

Connecticut.  (First Am. Compl. ¶ 6)  Thus, the undisputed facts demonstrate that the

alleged predicate offenses of mail and wire fraud have no place here.

### b)      18 U.S.C. 1344 (bank fraud)

18 U.S.C. § 1344 provides, in relevant part, that:

> Whoever knowingly executes, or attempts to execute, a      scheme
> or artifice --
>> **(1)** to defraud a financial institution; or
>> **(2)** to obtain any of the moneys, funds, credits, assets,
>> securities, or other property owned by, or under the custody
>> or control of, a financial institution, by means of false or
>> fraudulent pretenses, representations, or promises,

is guilty of bank fraud.  Here, there is no question regarding the fact that the Lewis

defendants did not obtain any money from a financial institution.  (Ex. A, Lewis Aff., ¶

47).  To the contrary, only the plaintiffs dealt with and obtained money from the bank.

Further, and notwithstanding the foregoing, the plaintiffs have not established that they

were injured by any alleged bank fraud and therefore have not established the necessary

proximate cause nexus.  Again, the plaintiffs' claim of bank fraud appears to be based

upon the clerical error in the HUD-1 settlement statement.   However, as demonstrated

above, the bank was well aware, in part due to Mr. Egbarin's making it so, that there was

a second mortgage and note prior to the closing.  If that were not the case, it would seem

that the bank might have a claim for fraud against Mr. Egbarin as he was the recipient of

the funds.  Thus, the plaintiffs claimed violation on 18 U.S.C. § 1344 fails as a matter of law and thus does not constitute a predicate act for the purposes of RICO.

### c)    18 U.S.C. 1503 (obstruction of justice)

The plaintiffs also claim that the defendants engaged in obstruction of justice under 18 U.S.C. § 1503.  This claim appears to be based upon the plaintiffs' untrue and previously litigated assertion that the state court judgment entered against them was obtained through some type of fraud.  This allegation, even if true, cannot establish a predicate act under RICO because it does not involve obstruction of justice in a federal proceeding.  Obstruction of justice in a state court proceeding cannot be considered a "predicate act" under RICO for purposes of establishing a pattern of racketeering. O'Malley, 896 F.2d at 707.  Thus, as with the other alleged predicate offenses, this too must fail as a matter of law.

**B.    The Plaintiffs' RICO Claim is Barred by the Applicable Statute
       of Limitations**

Even if the plaintiffs could sustain their burden of proving the stringent requirements set forth by the RICO statutes, their claim would nonetheless fail.  It is well settled that the statute of limitations for a civil RICO action is four years from the date the RICO claim accrued. Agency Holding Corporation v. Malley-Duff, 107 S.Ct. 2759, 2767 (1987).  A RICO cause of action accrues when the plaintiff suffers an injury, and

the statute of limitations begins running when the plaintiff discovers or should discover the injury.  In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 58 (2d. Cir. 1998).

The plaintiffs' alleged RICO claim is predicated upon a real estate transaction which closed on May 31, 1994 and lawsuits related thereto, which were commenced in March 1995 and December 1995.  The undisputed facts clearly demonstrate that the plaintiffs and their counsel, Attorney Lindbergh were well aware that their RICO claims had accrued in 1995.  See Statement of Undisputed Facts, ¶¶ 37-40.  In other words, they specifically knew of the injury/ies they are claiming to have sustained by the RICO violations alleged here in 1995.  Id.  Mr. Egbarin was deposed on December 8, 1995 relative to the Picard v. Egbarin matter.  Id.  On several occasions throughout the course of the deposition, Mr. Egbarin and his attorney accused Scott Lewis and the Picards of the same acts of alleged fraud and misrepresentation that they now submit as grounds for their RICO claim here.  Id.  In addition, as reflected in the relevant deposition testimony as well as the pleadings in both prior cases, the plaintiffs specially pleaded fraud and misrepresentation in their answer to the Picards' complaints.  Id.  Moreover, and perhaps more importantly, they counterclaimed on the basis of fraud and misrepresentation, thereby claiming damages as a result of the alleged, but unsubstantiated, offenses.  Id.  Thus, this action, initiated on May 23, 2000 well exceeds the four year RICO statute of limitations.

In sum, the plaintiffs' RICO claim fails as a matter of law because they have not and cannot prove the existence of an enterprise, they have not and cannot prove a single predicate act, let alone two, and because their action is barred by the four year statute of limitations.

**C. The Plaintiffs' RICO Claim is be Barred by the Doctrine of Res Judicata**

To the extent the plaintiff's alleged violation of RICO is predicated upon alleged misstatements of fact during the preceding actions by the Picards against them, the defendants' rely upon their arguments regarding the doctrine of res judicata and/or collateral estoppel set forth in the preceding sections, and will refrain from reiterating them here. Likewise, the same legal analysis applies to the extent the plaintiffs' fraud claim relates to allegations underlying the real estate transaction and procurement of the note.

To the extent the plaintiffs' RICO claim is predicated upon alleged misstatements of fact during the preceding actions by the Picards against them, the defendants' rely upon the doctrine of res judicata. The doctrine of Res Judicata (or claim preclusion) provides that a final judment on the merits in one action bars subsequent relitigation of the same claim by the same parties and by those in privity with the parties. Greenberg v. Board of Governors of the Federal Reserve System, 968 F. 2d 164, 168 (2d Cir. 1992) (citing N.L.R.B. v. United Technologies Corp., 706 F. 2d 1254, 1259 (2d Cir. 1983). It is well established that the rule of res judicata provides that a judgment on the merits of a cause of action puts an end to the cause of action, which cannot be brought again into litigation between the parties upon any ground whatsoever. Klein & Vibber, P.C. v.

<u>Collard & Roe, P.C.</u>, 3 F. Supp. 2d 167, 171 (1998); <u>Commissioner v. Sunnen</u>, 333 U.S.

591, 597 (1948).  The parties to the suit are thereafter bound not only as to every matter

that was offered to sustain or defeat the claim, but as to any other admissible matter that

might have been offered for that purpose.  <u>FDIC v. Lenz</u>, 323 F. Supp. 2d 342 (2004).  In

the present case, the Plaintiffs' alleged claims are predicated upon a transaction which

closed in May 1994 and lawsuits related thereto, which were commenced in March 1995

and December 1995.  As reflected in the relevant deposition testimony as well as the

pleadings in those prior cases, the Plaintiffs specifically alleged and pleaded fraud in

their answer to Defendants' Complaint.  See Statement of Undisputed Facts, ¶ 37-40.

The doctrine of res judicata thus applies to the extent that the plaintiffs' fraud claim

relates to allegations underlying the real estate transaction and procurement of the note

(i.e. plaintiffs were fraudulently induced into agreement).  The doctrine of res judicata

extends to both "issues actually decided in deteriming the claim asserted in the first

action and (to) issues that could have been raised in the adjudication of that claim."

<u>N.L.R.B. v. United Technologies Corp.</u>, 706 F. 2d 1254, 1259 (2d Cir. 1983).  Indeed, in

defending the preceding actions, the plaintiffs specially pleaded, testified about, and/or

otherwise raised the defenses of fraud, misrepresentation and the fact that the second

mortgage was not listed on the HUD-1 settlement statement.  <u>See</u> Statement of

Undisputed Facts, ¶¶ 37-40.[7]  Furthermore, the parties to this litigation and the prior litigation are identical and the record clearly demonstrates that these claims were previously heard by the Connecticut Superior Court.  Accordingly, there is no reason that Plaintiffs should be in federal court almost ten years later to relitigate claims that were raised or should have been raised back then in the State action.  The first judgment, which was a final determination of the matter, put an end to the whole cause of action.  Thus, the plaintiffs' claims of fraud were already litigated and rejected by virtue of the July 1998 judgment against them.  They are thus barred by the doctrine of res judicata.

As the Second Circuit has noted in analogous settings, "it does not matter that a RICO claim was not expressly asserted in the (earlier action), 'for it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies.'"  Saud v. Bank of New York, 929 F.2d 916 (2d Cir. 1991) (quoting Expert Elec., Inc. v. Levine, 554 F. 2d 1227, 1234 (2d Cir. 1977).

Whether the alleged factual circumstances and harms can be labeled a violation of RICO, fraud unfair trade practices, or otherwise, they are all part of a single cause of action, a cause of action that the Plaintiffs have already brought against the Defendants and that the Connecticut State Court already decided.  Accordingly, the Plaintiffs cannot

---

[7] See also Argument IB infra wherein Mr. Egbarin's December 8, 1995 deposition testimony is discussed in detail.

escape the doctrine of res judicata by inventing new legal labels or theories to place upon

the same cause of action that has already been adjudicated on the merits by the

Connecticut Superior Court.  <u>Media Group, Inc. v Tuppatsch</u>, 298 F. Supp. 2d 235 (2003)

(barring a RICO claim which was based on circumstances and an underlying claim that

was essentially the same as a previous cause of action that had been previously dismissed

by state court.)


**II.    FAIR DEBT COLLECTION PRACTICES ACT ("FDCPA")**

The undersigned defendants do not address this count here as it does not pertain to

them, but rather to only the Lewis defendants.


**III.    FRAUD**

**A.    <u>The Plaintiffs' Fraud Claim Is Barred By the Doctrine</u>**
**<u>of Collateral Estoppel and/or the Doctrine of Privilege</u>**

The plaintiffs next reiterate their RICO and FDCPA claims in their common law

fraud cause of action, i.e. that the defendants fraudulently induced them to sign a

promissory note and thereafter obtained a judgment against them through fraudulent

means.  They further appear to include the grievance claim as a basis for their claim of

fraud.  Specifically, they allege that "[t]he defendants obtained several court judgments

to the detriment of the plaintiffs, upon the misrepresentations of material fact and or nondisclosure by the defendants that were made to induce the reliance by the courts and the plaintiffs."  (First Am. Compl., Third Count, ¶¶ 158-159).

In addition, to the extent the plaintiffs' fraud claim is predicated upon the filing of and prosecution of the grievance against Mr. Egbarin, the defendants rely on the doctrine of absolute privilege as a bar to the claim.  "[T]he act of filing a grievance with the Statewide Grievance Committee is privileged, and the person who files the complaint is immune from tort liability arising out of not only his statements during the proceeding but also out of the filing of the complaint."  Pantaleo v. Raviski, 1997 WL 94103 (Conn. Super) citing Field v. Kearns, 43 Conn. App. 265 (1996).  (Pantaleo Attached hereto as Ex. F).  Thus, even if there was any factual basis for the plaintiffs' claims of fraud relating to the grievance the defendants were forced to file, which there is not,[8] the plaintiffs are precluded from basing a fraud claim on the filing of the grievance and the proceedings relating thereto by virtue of the doctrine of privilege.

**B.**    **The Plaintiffs' Fraud Claim is Barred by the Applicable Statute of Limitations**

The three year statute of limitations set forth in Connecticut General Statutes § 52-577 governs actions sounding in fraud.  Krondes v. Norwalk Savings Society, 53

---

[8]  See n.2, supra.

Conn. App. 102, 113 (1999). The plaintiffs' claim of fraud is based upon allegations that the defendants fraudulently induced them to sign a promissory note on or before May 31, 1994 and thereafter obtained a judgment against them through fraudulent means. This judgment arose from two preceding lawsuits, the first of which was filed in March 1995. As demonstrated above, the undisputed facts clearly indicate that the plaintiffs and their counsel at the time, were well aware of the allegations of fraud that form the basis for their fraud claims here on <u>December 8, 1995</u>, <u>at the latest</u>. Mr. Egbarin's testimony, the commentary by his lawyer and the previously filed special defenses could not be more clear. Thus, this action which commenced on May 23, 2000 well exceeds three years from December 8, 1995. The plaintiffs' common law fraud claim, is therefore, time barred.

**C.     <u>The Plaintiff's Fraud Claim is Barred by the Doctrine of Res Judicata</u>**

To the extent the plaintiffs' claim of fraud is predicated upon alleged misstatements of fact during the preceding actions by the Picards against them, the defendants' rely upon their arguments regarding the doctrine of res judicata and/or collateral estoppel set forth in the preceding sections, and will refrain from reiterating them here. Likewise, the same legal analysis applies to the extent the plaintiffs' fraud claim relates to allegations underlying the real estate transaction and procurement of the note.

## IV.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### A.    The Plaintiffs' Intentional Infliction of Emotional Distress Claim Fails    to State a Claim Upon Which Relief Can be Granted

The Connecticut Supreme Court has recently enunciated that:

> Liability for intentional infliction of emotional distress
> has been found only where the conduct has been so
> outrageous in character, and so extreme in degree,
> as to go beyond all possible bounds of decency, and
> to be regarded as atrocious, and utterly intolerable in
> a civilized community.  Generally, the case is one in
> which the recitation of the facts to an average
> member of the community would arouse his
> resentment against the actor, and lead him to
> exclaim, "Outrageous!"

Morrissey v. Yale University, 268 Conn. 426, 428 (2004) (citation, internal quotation marks and brackets omitted).  The following four elements must be proven before liability for intentional infliction of emotional distress will attach:  "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendants' conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."  Hartmann v.

<u>Gulf View Homeowners Association, Inc.</u>, 88 Conn. App. 290, 294 (2005) (citation and internal quotation marks omitted). "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine." <u>Id</u>. at 295.

Here, the plaintiffs claim that the defendants' actions relative to the real estate transaction and subsequent lawsuits related thereto amount to intentional infliction of emotional distress. A review of the plaintiffs' allegations in this regard, as well as the undisputed facts, demonstrate nothing more than that the defendants engaged in a basic real estate transaction, with the Plaintiffs which included the plaintiffs signing a promissory note on which they later defaulted. Thereafter, the defendants attempted to collect on the note and also pursued a grievance action against Nitor Egbarin on their clients' behalf. In short, the allegations and undisputed facts reveal that the defendants were simply attempting to assert their rights within normal and accepted parameters. This is hardly "Outrageous!" and simply does not rise to the level of intentional infliction of emotional distress. The plaintiffs' claim in this regard, therefore, must fail as a matter of law.

**B.    The Plaintiffs' Intentional Infliction of Emotional Distress Claim
        is Barred by the Applicable Statute of Limitations**

"The applicable statute of limitations period for a claim of intentional infliction of emotional distress is three years."  DeCorso v. Watchtower Bible & Tract Society of New York, Inc., 78 Conn. App. 865, 873 (2003).  All of the acts giving rise to the plaintiffs' claim for intentional infliction of emotional distress fall well outside that time frame.  Specifically, the real estate transaction at issue occurred in 1994 and the lawsuits relating thereto were commenced in 1995.  The plaintiffs and their counsel were well aware of the claims which form the basis for this cause of action, namely alleged fraud and misrepresentation by the defendants, by December 8, 1995, at the latest.  See detailed discussion in this regard, infra.  Again, May 23, 2000 well exceeds the applicable statute of limitations for this claim.  Thus, there is no question that the plaintiffs' intentional infliction of emotional distress claim is barred by the doctrine of res judicata.

**C.   The Plaintiffs' Intentional Infliction of Emotional Distress Claim is Barred by the Doctrine of Res Judicata**

To the extent the plaintiffs' claim of intentional infliction of emotional distress is predicated upon alleged misstatements of fact during the preceding actions by the Picards against them, the defendants' rely upon their arguments regarding the doctrine of res judicata and/or collateral estoppel set forth in the preceding sections, and will refrain from reiterating them here.  Likewise, the same legal analysis applies to the extent the

plaintiffs' intentional infliction of emotional distress claim relates to allegations

underlying the real estate transaction and procurement of the note.


**V.      NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**A.  <u>The Plaintiffs' Negligent Infliction of Emotional Distress Claim</u>**
**<u>Fails to State a Claim Upon Which Relief Can be Granted</u>**

The four elements for negligent infliction of emotional distress are "1) the

defendant's conduct created an unreasonable risk of causing emotional distress; 2) the

plaintiff's emotional distress was foreseeable; 3) the emotional distress was severe

enough that it might result in illness or bodily harm; and 4) the defendant's conduct was

the cause of the plaintiff's distress."  <u>Carroll v. Allstate Insurance Co.</u>, 262 Conn. 433,

444 (2003).  As indicated in the previous section, the defendants' conduct in this case

amounted to nothing more than the appropriate assertion of their legal rights.  They

followed a natural, logical and reasonable progression of steps related to asserting such

rights with respect to  a real estate transaction, securing a promissory note from the

plaintiffs, and seeking to enforce the note once the plaintiffs defaulted thereon.  This type

of normal and expected behavior simply does not rise to the level of negligent infliction

of emotional distress and the plaintiffs' claim must fail in this regard.  <u>See</u> <u>e.g.</u> <u>Shattuck</u>

<u>v. Town of Stratford</u>, 2005 WL 941415 (Conn. Super.) (granting defendants motion for

summary judgment where defendants, in performing their job functions rationally and

reasonably, were not liable for negligent infliction of emotional distress).  (Attached

hereto as Ex.G).  The plaintiffs' claim in this regard, therefore, must fail as a matter of

law.

**B.**     **The Plaintiffs' Negligent Infliction of Emotional Distress Claim**
           **is Barred by the Applicable Statute of Limitations**

The two year statute of limitations set forth in Conn. Gen. Stat. § 52-584 governs

claims for negligent infliction of emotional distress.  Lounsbury v. Camby, 2004 WL

303687 (Conn. Super.)  (Attached hereto as Ex. H).  As reiterated on several occasions

above, this action was initiated in May, 2000, well beyond two years from the alleged

incidents giving rise to the plaintiffs' claims.  Specifically, the real estate transaction and

closing took place in 1994 and the subsequent lawsuits were initiated in 1995.  The

plaintiffs and their counsel knew on or about December 8, 1995, at the latest, of their

unsubstantiated belief that the defendants had committed fraud and misrepresentation.

The plaintiffs' claims in this regard, therefore, are time barred.[9]

**C.  The Plaintiffs' Negligent Infliction of Emotional Distress Claim is**
**Barred by the Doctrine of Res Judicata**

---

[9] It also bears noting that the plaintiffs only injected this cause of action in their First Amended
Complaint dated July 26, 2004.  Thus, even if the plaintiffs' could establish that the cause of
action was timely as of 2000, there would still exist a relation back question as this was not part
of the original action.

To the extent the plaintiffs' claim of negligent infliction of emotional distress is predicated upon alleged misstatements of fact during the preceding actions by the Picards against them, the defendants' rely upon their arguments regarding the doctrine of res judicata and/or collateral estoppel set forth in the preceding sections, and will refrain from reiterating them here.  Likewise, the same legal analysis applies to the extent the plaintiffs' negligent infliction of emotional distress claim relates to allegations underlying the real estate transaction and procurement of the note.

## VI.    TORTIOUS INTERFERENCE WITH BUSINESS

### A.    <u>The Plaintiffs' Tortious Interference With Business Claim Fails to    State a Claim Upon Which Relief Can be Granted</u>

Tortious interference with business, also known as "tortious interference with contractual relations," is proven only upon satisfaction of the following five elements: (1) the existence of a contractual or beneficial relationship; (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship; (4) the interference was tortuous; and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct.  <u>Collum v. Chapin</u>, 40 Conn. App. 449, 452 (1996).  The plaintiffs' claim in this regard is that the defendants' alleged actions

caused "the demise and total destruction" of Nitor Egbarin's law practice.  (First Am.

Compl., Sixth Count, ¶ 172).

     More specifically, the plaintiffs contend that during the action on the note, the

trial court, on March 24, 1996, granted a PJR attachment relative to, among other things,

the plaintiff's law practice.  (First Am. Compl. ¶¶ 75-76).  The plaintiff was thereafter

"compelled" to inform his clients accordingly and his existing clientele transferred their

cases and his referral business "dried up."  (Id. at ¶¶ 77-78).  Even if proven, however,

this does not give rise to a valid tortious interference with business cause of action.

     First, the impetus behind the defendants' actions in bringing a lawsuit was to

enforce the promissory note upon which the plaintiffs' had defaulted and nothing more.

The defendants were not driven by an intent to interfere with the plaintiff's law practice,

a fact which the plaintiffs have not and cannot dispute.  (Ex. A, Lewis Aff., ¶ 48)

Second, even if the actions relating to the action on the note could be considered

"interference," there are no facts to support the conclusion that this interference was

tortious.  The defendant's were asserting their legal rights in accordance with the rules of

legal practice in Connecticut.  Indeed, to the extent this alleged interference is predicated

upon alleged misstatements during the PJR hearing, the plaintiffs cannot, as a matter of

law, establish the tortious requirement because of the privilege, as described above,

which attached to the proceeding.  Third, and quite importantly, the plaintiffs have not

and cannot establish that the demise of the law practice was a result of the PJR

attachment.  In point of fact, the plaintiff's law practice evaporated by virtue of his own

actions which resulted in his disbarment.

Thus, the plaintiffs' claim of tortious interference with business must fail as a

matter of law.

**B.**  **The Plaintiffs' Tortious Interference With Business Claim is**
**Barred by the Applicable Statute of Limitations**

The three year statute of limitations set forth in Conn. Gen. Stat. § 52-577 governs

claims for tortious interference with business.  As indicated above, the plaintiffs' claim in

this regard derives from the fact that on March 24, 1996 the trial court issued a PJR

attachment relative to Nitor Egbarin's law practice which ultimately resulted in it's

demise.  This action, however, was not commenced until May 23, 2000, well over three

years from the date the attachment was issued.  Thus, the plaintiffs' tortious interference

with business claim is time barred.[10]

**C.**  **The Plaintiffs' Claim of Tortious Interference with Business if**
**Barred by the Doctrine of Res Judicata**

The plaintiff's claim of tortious interference with business is barred by the

doctrine of res judicata.  To the extent the plaintiffs' claim of tortious interference with

---

[10] It also bears noting that the plaintiffs only injected this cause of action in their First Amended Complaint dated July 26, 2004.  Thus, even if the plaintiffs' could establish that the cause of action was timely as of 2000, there would still exist a relation back question as this was not part of the original action.

business is predicated upon alleged misstatements of fact during the preceding actions by the Picards against them, the defendants' rely upon their arguments regarding the doctrine of res judicata and/or collateral estoppel set forth in the preceding sections, and will refrain from reiterating them here.  Likewise, the same legal analysis applies to the extent the plaintiffs' tortious interference with business claim relates to allegations underlying the real estate transaction and procurement of the note.

**VII.    CUTPA**

### A.   The Plaintiffs' CUTPA Claim Fails to State a Claim Upon Which Relief Can be Granted

The plaintiffs' final claim is that the defendants' actions relative to the real estate transaction and following lawsuits amount to a violation of "CUTPA,"Connecticut's Unfair Trade Practices Act, (Conn. Gen. Stat. § 42-110).  As with the previous claims, this too must fail as a matter of law.

As demonstrated above, the allegations of the plaintiffs' complaint and the undisputed facts reveal nothing more than a situation wherein the defendants were engaging in a lawful real estate transaction and asserting their legal rights with respect to such real estate transaction.  This clearly falls outside of the applicability of CUTPA and thus, the plaintiffs' claims in this regard must fail as a matter of law.

**B.    The Plaintiffs' CUTPA Claim is Barred by the Applicable Statute of Limitations**

Section 42-110g(f) of the Connecticut General Statutes provides for a three year statute of limitations for CUTPA actions. As repeatedly emphasized above, the plaintiffs' claims in this action relate to a 1994 real estate transaction and to 1995 lawsuits related thereto. Their complaint, dated May 23, 2000, clearly exceeds the three year statute of limitations for CUTPA by at least one year. As such, the plaintiffs' claims in this regard are time barred.[11]

**C.  The Plaintiff's CUTPA Claim is Barred by the Doctrine of Res Judicata**

To the extent the plaintiff's alleged violation of CUTPA is predicated upon alleged misstatements of fact during the preceding actions by the Picards against them, the defendants' rely upon their arguments regarding the doctrine of res judicata and/or collateral estoppel set forth in the preceding sections, and will refrain from reiterating them here. Likewise, the same legal analysis applies to the extent the plaintiffs' CUTPA claim relates to allegations underlying the real estate transaction and procurement of the note. (see *MediaGroup Inc. v. Tuppatsch, supra*. barring a CUTPA claim based on res judicata.)

---

[11] It also bears noting that the plaintiffs only injected this cause of action in their First Amended Complaint dated July 26, 2004. Thus, even if the plaintiffs' could establish that the cause of action was timely as of 2000, there would still exist a relation back question as this was not part of the original action.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, the defendants' motion for summary

judgment should be granted.


**THE DEFENDANTS,**
**CLAUDE J. and PAULINE M. PICARD**


By_____

    Joseph V. Meaney, Jr.
    Fed. Bar. #ct 04315
    Cranmore, FitzGerald & Meaney
    49 Wethersfield Avenue
    Hartford, CT  06106
    Tel: (860) 522-9100
    Fax: (860) 522-3379

## **CERTIFICATION**

This is to certify that on this 27th day of May, 2005, I hereby mailed a copy of the foregoing to:


Thomas J. Hagarty, Jr., Esq.
Laura Pascale Zaino, Esq.
Halloran & Sage
One Goodwin Square
225 Asylum Street
Hartford, CT  06103

Nitor V. Egbarin and
Janet J. Egbarin
28 Ely Place
Simsbury, CT 06070

Nitor V. Egbarin and
Janet J. Egbarin
P.O. Box 230421
Hartford, CT 06123-0421


_____
Joseph V. Meaney, Jr.