UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NITOR V. EGBARIN, AND JANET J. EGBARIN<br><br>Plaintiffs,<br><br>v.<br><br>LEWIS, LEWIS & FERRARO LLC, SCOTT F. LEWIS, CLAUDE J. PICARD AND PAULINE M. PICARD<br><br>Defendants. | CASE NO. 3:00 CV 01043 (JCH)<br><br>June 9, 2005 |

PLAINTIFFS' MEMORANDUM OF LAW IN
<u>OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>

The plaintiffs Nitor V. Egbarin, "plaintiff" or "Mr. Egbarin," and Janet J. Egbarin, "plaintiff" or "Mrs. Egbarin," submit the following Memorandum of Law in opposition to the Motions for Summary Judgment submitted by Lewis, Lewis & Ferraro LLC, Scott F. Lewis, Claude J. Picard, "Mr. Picard," and Pauline M. Picard, "Mrs. Picard," both Motions dated May 27, 2005.

**SUMMARY OF FACTS**

On September 16, 1992, plaintiffs and the Picard defendants entered into an agreement entitled" Purchase, Sale and Lease Agreement," "Agreement." The Agreement provided, amongst other things, the purchase price of $330,000 for the property at 8 Northcliff Drive, Bloomfield, Ct, "property." In the Agreement,

the plaintiffs were to obtain a mortgage commitment from a lending institution within the period of the Agreement. (**Ex. 7**, Agreement, ¶¶ 1 & 10). Under the Agreement, plaintiffs had the right to extend the time for six (6) months to April 1, 1994, to obtain a mortgage. (**Id**).

In the transaction, the Picard defendants were represented by Scott Lewis, hereinafter "Lewis," and his law firm Lewis, Lewis & Ferraro LLC, "Lewis Lewis." Lewis and his firm Lewis Lewis practice primarily in Litigation foreclosure collection and real estate closings. (Ex. 3, PP. 40-41). Pauline M. Picard and Claude J. Picard developed and sold the property to the plaintiffs.

Sometime between January and March 1994, Mr. Picard talked with Mr. Rifkin on behalf of the plaintiffs and referred Mr. Egbarin to go and see Mr. Rifkin, Owner of Sanborn Corporation, "Sanborn."

On March 25, 1994 Mr. Egbarin saw Mr. Rifkin and applied for mortgage through Sanborn Mortgage Corporation, "Sanborn." (**Ex 8**, Uniform Residential Loan Application, "URLA."). Sanborn orally approved the mortgage application based on the application and the plaintiffs' credit report, (**Ex. 9**, Credit Report of the Egbarins); (**Ex. 1**, Egbarin Aff. ¶8). On this same

day, plaintiffs promptly informed Mr. Picard that Sanborn orally approved the application for mortgage. **(Ex. 1**, Egbarin Aff. ¶9).

By April, 1994 plaintiffs had met their obligation under the Agreement, and had paid $29,500 into escrow which Mr. and Mrs. Picard were holding for the plaintiffs to use toward the down payment for the closing on the property. **(Ex. 1**, Egbarin Aff. ¶11). The Picards confirmed these cash escrow payments to Sanborn in a document **(Ex. 11)**, which the Picards signed and sent to Sanborn on May 3, 1994 when Sanborn was verifying the plaintiffs' mortgage application. **(Ex. 1**, Egbarin Aff. ¶14)

After Sanborn did an appraisal of the property in April 1994, **(Ex. 10**, Uniform Residential Appraisal Report, dated April 22, 1994, "URAP."); **(Ex. 1**, Egbarin Aff. ¶13), Sanborn formally offered a mortgage to the plaintiffs in a Commitment Letter dated May 12, 1994. **(Ex. 12)**. The mortgage commitment required a revised Agreement with a price that was consistent Sanborn's appraised value of $300,000. **(Ex. 10)**; **(Ex. 1**, Egbarin Aff. ¶15).

At this point it became necessary to amend the Agreement. **(Ex. 1**, Egbarin Aff. ¶13).

On the Saturday in between May 12, 1994 and May 19, 1994, Mr. Picard and Mr. Egbarin met to discuss the requirement to amend the Agreement. **(Ex. 1**, Egbarin Aff. ¶17). Picard insisted

3

he wanted to receive $330,000 for the property instead of the bank appraised value of $300,000 and offered Mr. Egbarin a mortgage for $30,000, the difference between the appraised value of $300,000 and the purchase price of $330,000. **(Ex. 1,** Egbarin Aff. ¶17). The plaintiffs did not apply for this mortgage nor did the plaintiffs come to this meeting with their tax returns. Also, the plaintiffs never gave Mr. Picard the plaintiffs' tax returns at this meeting before Mr. Picard offered the second mortgage. **(Ex. 1,** Egbarin Aff. ¶50).

Mr. Egbarin accepted Mr. Picard's offer of a mortgage for $30,000 in reliance on Mr. Picard's representations that Mr. Picard arranged with the appraiser to set the value of the property at $300,000 and that Mr. Picard still had equity in the property. At the end of the meeting, Mr. Picard stated his lawyer, Lewis, would draw up the paper work (**Ex. 1,** Egbarin Aff. ¶17); (**Ex 5,** Egbarin Dep. Trans. pp. 74-79, 82-83).

The defendants drafted the paperwork, the Amendment to Purchase and Sale Agreement, "Amendment Agreement," and faxed it to the Mr. Egbarin. **(Ex. 1,** Egbarin Aff. ¶¶ 19 and 20). The plaintiffs signed the Amendment Agreement and sent it in the U.S mail to the Picards. **(Ex. 1,** Egbarin Aff. ¶ 21). One of the defendants sent the fully signed original Amendment Agreement in the U.S mail to Sanborn. **(Ex. 1,** Egbarin Aff. ¶22),

4

According to the defendants, the Amendment Agreement reclassified the $30,000 cash deposit held in escrow, **(Ex 11, Escrow)**, as "rent." **(Ex. 3,** Lewis Dep. Trans., pp 64-65 & 134). But the Picards did not report the $30,000 as rent in their 1993 or 1994 tax returns, (Picards' Tax Returns attached to **Ex. 37 & Ex. 38)**, and not one of the defendants told Sanborn that the $30,000 cash escrow was no longer to be the down payment for the closing. **(Ex. 3,** Lewis Dep. Trans. Pp. 143-144); **(Ex. 37,** Admissions, # 75); **(Ex. 38,** Admissions, # 89).

At the closing on May 31, 1994, the plaintiffs obtained a mortgage loan of $270,000 from Sanborn and used the $30,000 cash in escrow **(Ex 11, Escrow)**, as the down payment. **(Ex 6,** Gilligan Dep. Trans. pp. 45-47). The Egbarins did not need an additional sum of $30,000 to close the transaction. **(Ex 5,** Egbarin Dep. Trans. pp. 7, 100-101); **(Ex 6,** Gilligan Dep. Trans. pp. 38-39 and 96-97).

At the closing, Lewis secretly presented a promissory note and statutory mortgage deed for $30,000 to Mr. Egbarin to sign. Lewis signed as a witness and did not give a copy of the promissory note and statutory mortgage deed for $30,000 to Mr. Egbarin at the closing. **(Ex. 1,** Egbarin Aff. ¶ 24).

Lewis never gave any copy of the Statutory Mortgage Deed and Promissory Note for $30,000, "second mortgage documents,"

5

(**Ex. 14 & Ex. 15**) to the bank's closing attorney, attorney Gilligan, "Gilligan." (**Ex 6,** Gilligan Dep. Trans., pp.28-30, 34-38, 47, 50 and 70-71); (**Ex. 2,** Borrelli Rep. p 4).

Gilligan testified that the $30,000 loan in the mortgage documents (**Ex. 14 & Ex. 15**) is not listed in the Hud-1 Settlement Statement. (**Ex. 16,** HUD-1); (**Ex 6,** Gilligan Dep. Trans., pp. 44-48 and 96-97). Plaintiffs' expert Laura Borrelli, "Borrelli," confirmed that this $30,000 loan was not listed in the HUD-1. (**Ex. 4,** Borrelli Dep. Trans., pp. 22 and 67-69).

Also, neither the bank's attorneys' closing file nor the bank's file for the Egbarins contains any copy of the second mortgage documents. (**Ex 6,** Gilligan Dep. Trans. pp.28-30, 34-38, 47, 50, and 70-71); (**Ex. 2,** Borrelli Rep. p 4); (**Ex. 4,** Borrelli Dep. Trans., pp. 38-40, and 69-71); (**Ex. 1,** Egbarin Aff. ¶47 and ¶48).

Plaintiffs' expert opinion recently confirmed that the defendants violated Residential Mortgage banking law, 18 U.S.C §1001 (**Ex.17**), when they concealed the second Mortgage documents from the bank or its closing agent, Robert Gilligan of Mayo, Gilligan and Zito. (**Ex. 2,** Borrelli Rep. p 4); **See**, Plaintiffs' 56(a) 2 Statement, ¶ **20.**

6

Lewis recorded the second mortgage documents in the lands Record office, in Bloomfield. **(Ex. 2**, Borrelli Rep. p 3**);** **(Ex. 4**, Borrelli Dep. Trans. pp. 7, 22 and 46**)**.

In January 1995, Plaintiffs refused to make payments on the second mortgage because the plaintiffs believed plaintiffs did not receive consideration for this mortgage. (**Ex. 1**, Egbarin Aff. ¶¶ 27, 28 & 29).

In March 1995, Lewis filed an action **(Ex. 20)** in the Hartford Superior court to foreclose on the second mortgage. (**Ex. 1**, Egbarin Aff. ¶29); See, Def. Statement of Undisputed Fact, ¶28.

In December 1995, in the course of the foreclosure action, defendants filed false affidavits containing several misrepresentations about the transaction that took place on May 31, 1994. (**Ex. 1**, Egbarin Aff. ¶30 & ¶31).

On January 22, 1996 at a Hearing in this foreclosure action, Lewis lied to Judge Freed that the RESPA **(Ex.16)** lists the second mortgage. (**Ex. 24**, Court Transcript, P. 3).

The $30,000 loan (**Ex. 14 and Ex. 15**) is not listed in the Hud-1 (**Ex. 16**), (**Ex 6**, Gilligan Dep. Trans., pp. 44-48 & 96-97**)**, because the commitment letter did not permit subordinate financing, (**Ex 6**, Gilligan Dep. Trans., pp. 9, 36 & 44-45**)**, and because Lewis never gave any copy of the second mortgage

7

documents to the bank's closing attorney. **(Ex 6,** Gilligan Dep. Trans., pp. 28-30, 34-38, 47, 50 & 70-71**); (Ex. 2,** Borrelli Rep. p 4);( **Ex. 4,** Borrelli Dep. Trans., pp 37-40).

On July 15, 1996, in another hearing before Judge Freed in this same action, Lewis once again lied to Judge Freed that lines 201 and 506 of the HUD-1 **(Ex.16)** list his clients' loan for $30,000. See, Ex. 29, Court Transcript, PP. 22-25.

Lewis also lied that he fully disclosed the Statutory Mortgage Deed and Promissory Note for $30,000 to the bank. See, **(Ex. 29,** Court Transcript P. 23**)**.

There <u>was</u> <u>never</u> <u>any</u> <u>copy</u> and <u>there</u> <u>is</u> <u>no</u> <u>copy</u> of the Statutory Mortgage Deed and Promissory Note for $30,000 **(Ex. 14 and Ex. 15)** in the bank's file or in the bank's closing attorney's file. (**Ex 6,** Gilligan Dep. Trans., pp. 28-30,34-38, 47, 50, and 70-71); **(Ex 4,** Borrelli Dep. Trans., pp. 38-40, & 69-71).

Even Lewis admitted that the contents of the bank's file would only have come from the Closing file. **(Ex. 3,** Lewis Dep. Trans., p 151**)**. However, there was no copy of the second mortgage documents in the bank's file when plaintiffs subpoenaed the banks file for this matter or when the plaintiffs were supplied with a copy of the bank's file when Lewis subpoenaed

8

these files in 1996, in respect of the PJR hearing in the New Britain superior court action. **(Ex. 1**, Egbarin, Aff. ¶47**)**.

In February 1996, during a hearing on the second action in New Britain Superior Court for a prejudgment remedy attachment, "PJR," **(Ex. 23)**, Lewis hid from the court the fact that the 30,000 debt he was trying to collect was concealed from the bank on May 31, 1994. Lewis lied to the court and said the $30,000 debt was the down payment for the closing on May 31, 1994. **(Ex. 1**, Egbarin Aff. ¶38**)**. See **(Ex. 29.)**

After the PJR hearing, plaintiffs received amongst others, the following multiple court orders in the U.S mail; (1) court order of attachment dated February 13, 1996 **(Ex. 25)**, (2) court order dated March 4, 1996, freezing my assets **(Ex. 26)**, (3) court order dated October 30, 1996, freezing my bank accounts, including my out-of-state credit card bank accounts **(Ex. 27)**, (4) notice from the court that a copy of the order dated October 30, 1996 was sent by interstate wire to the several out-of-state banks where I maintained credit card accounts, (5) court order dated April 7, 1997, freezing my personal injury cases **(Ex. 30)**. **(Ex. 1**, Egbarin Aff. ¶39, ¶40, ¶41, ¶42, ¶43, and ¶44**)**.

In April 1998, Plaintiffs received in the U.S mail another affidavit dated April 24, 1998 **(Ex. 34)** in this PJR action. The affidavit falsely stated that the Picards "transferred [the

9

property to the plaintiffs] for the sum of $300,000 of which $270,000 came from the [] loan with Sanborn and $30,000 was by way of the note (Ex. 14 and Ex. 15)..." **(Ex. 34)**.

This and the previous affidavits are clearly false because the HUD-1 **(Ex. 16)** shows a contract price of $300,000 for the property but the Picards received $330,000 as the consideration for the property. **(Ex. 2, Borrelli Rep. p 4)**. Also, the deposit or earnest on the HUD-1 **(Ex. 16)** is intended to mean cash not a note or mortgage. (**Ex 6,** Gilligan Dep. Trans. p 48); **(Ex. 4,** Borrelli Dep. Trans. pp 41 & 64-65).

In July, 1998, based on this false affidavit, Plaintiffs received in the U.S mail an order of Summary judgment that was entered on July 2, 1998. (**Ex. 1**, Egbarin Aff. ¶45 and ¶46).

Earlier in January 1997, the plaintiffs filed for bankruptcy protection and the defendants filed papers in the bankruptcy court on February 4, 1997. (**Ex. 30,** Defendants' bankruptcy Papers).

Lewis claims that plaintiffs' bankruptcy lawyer told him in the course of the bankruptcy that Mr. Egbarin did not file his tax returns for 1992 and 1993

On February 13, 1997, Lewis and the Picards immediately filed a grievance action solely on the basis of a hearsay statement, to impound the plaintiff's law license because the

defendants were unable to seize substantial assets from the plaintiff's law practice. (**Ex. 33**, Transcript of Grievance Hearing, September 10, 1997, **"Griev. Trans." PP. 32-33)**.

Lewis told the court in the PJR hearing that Mr. Egbarin was engaged in money laundering. Lewis also told Mr. Egbarin he was going to teach people like Mr. Egbarin a lesson and put Mr. Egbarin in his place. (**Ex. 1**, Egbarin Aff. ¶49). Lewis inadvertently confirmed this in court. See, (Ex. 24, Court Transcript, P. 4)

In March 1997, Lewis filed amended grievance charges where he fully explained the basis for his charges. **(Ex 31)**. Lewis also testified that he relied on hearsay to file grievance charges against the plaintiff. (**Ex. 33**, Griev. Trans. pp 32-33).

These false charges were dropped. (**Ex. 1**, Egbarin Aff. ¶49). Lewis had no supporting facts and did not even call as a witness, plaintiffs' bankruptcy lawyer who told him that Mr. Egbarin did not file his tax returns with the IRS. (**Ex. 1**, Egbarin Aff. ¶49). The grievance panel found that the plaintiffs' tax returns were filed with the IRS. (**Ex. 33**, Griev. Trans. pp 22-24).

The grievance committee claimed a new theory in the presentment before Judge Berger. See, (**Ex. 35**, <u>Grievance</u>

Committee v. Egbarin), (Conn. Super, docket # CV98-0585474S, June 22, 1999).

In March 1999, Lewis and Mr. Picard testified at the presentment hearing. Mr. Egbarin's license was suspended on June 22, 1999 based exclusively on the submissions and testimonies of Lewis and Mr. Picard. **(Id, at PP. 8-11)**.

On appeal, however, the appellate court concluded that the testimonies of Lewis and Mr. Picard were sufficient to support the trial court's conclusions since it was the prerogative of the court to determine what weight, if any, to give to the testimony of Picard and Lewis. Grievance Committee v. Egbarin, 61 Conn. App. 445, 459, 767 A.2d 732, (2001), cert. denied 255 Conn. 949, 769 A.2d 64(2001).

The newly evidence discovered in this matter now shows that the testimonies of Lewis and Mr. Picard should not have been given that much weight in the grievance presentment hearing.

Lewis also lied under oath in this matter. See **(Plaintiffs' 56(a) 2 Statement, ¶¶18, 20, 22, 23, 26, 27, 28, 29, & 30)**.

These misconducts of Lewis, infra, violate professional Rules of Conduct, Rule 3.3, 4.1 and 8.4. **Ex. 40; Ex. 41, & Ex. 42)**.

**STANDARD OF REVIEW**

Summary judgment is appropriate when evidence in the record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether the record presents genuine issue for trial, the court must view all inference and ambiguities in a light more favorable to the non-moving party. See Bryant v. Maffacci, 923 F.2d 979, 19 982 (2d Cir.), cert. denied, 112 S. Ct. 152 (1991). A genuine issue of material fact exists if a "jury could reasonably find for the plaintiff."Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). The party moving for summary judgment must show that there is no genuine issue of material fact. Liberty Lobby, supra, at 247-48 (emphasis original).

If the evidence produced by the defendant in support of its motion for summary judgment does not meet this burden, "summary judgment must be denied even if no opposing evidentiary matter is presented." (Adickes v. S.H. Kress & Co., 398 U.S. 144, 160 (1970) because "[n]o defense to an insufficient showing is required." Id. at 161. See, also, Reed v, Bennet 312 F.3d 1190 1194-95, (10th Cir. 2002); Amaker v. Foley, 274 F.3d 677, 681 (2nd Cir. 2001).

In deciding whether a genuine issue of material fact has been raised as to an issue, this Court "must construe the facts in the light most favorable to the non-moving party [Plaintiffs] and must resolve all ambiguities and draw all reasonable inferences against the movant [Defendants]." Baisch v. Gallina, 346 F.3d 366, 371-72 (2d Cir. 2003). Moreover, even if the underlying facts are undisputed, but the reasonable inferences which can be drawn there from are in dispute, summary judgment is inappropriate. See Cali v. Eastern Airlines, Inc., 442 F.2d 65, 71 (2d Cir. 1971).

Plaintiffs are only required at this summary judgment stage, to come forward with evidence as to the facts specifically challenged by defendants and which facts are appropriately supported by the defendants' references to specific undisputed evidence. See Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 160-61 (1970); Amaker, 274 F.3d at 681; Reed, 312 F.3d at 1194-95.

## LAW AND ARGUMENT

### A. RICO

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961(c) simply requires that plaintiffs

prove: (1) that the defendants (2) through the commission of two or more acts (3) constituting a pattern (4) of racketeering activity (5) participated in (6) an enterprise (7) the activities of which affect interstate of foreign commerce. Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983)(citing 18 U.S.C. §§ 1962(c).

The federal offenses that constitute the basis for a claim of racketeering activity include the following offenses alleged by the plaintiffs: mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; bank fraud in violation of 18 U.S.C. § 1344 and; obstruction of justice in violation of 18 U.S.C. § 1503.

### 1. Defendants' activities constitute an enterprise under the RICO statute

The Lewis Defendants and the Picard defendants claim that Plaintiffs have failed to establish the existence of a RICO enterprise.

The defendants associated together amongst each other in the manner described below, directing the affairs of a racketeering enterprise established for the commission of criminal acts.

"Enterprise is defined to include any individual, partnership, corporation, association or other legal entity and any union or group of individuals associated in fact although not a legal entity." Bankers Trust Co. v. Rhoades, 741 F.2d 511, 515 (2nd Cir. 1984), (quoting 18 U.S.C §1961(4)). "For an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purpose." First Nationwide Bank v. Gelt Funding Corp., 820 F. Supp 89, 98 (S.D.N.Y 1993), aff'd 27 F. 3d 763 (2d Cir. 1994). Cited in First Capital Asset Management v. Satinwood, Inc., 358 F.3d 159, (2d Cir. 2004).

The enterprise in this matter is an association of individuals, who are Mr. Picard, Mrs. Picard and Lewis. These individuals shared the common purpose of defrauding a lending bank and the plaintiffs when they lied and hid facts in order to obtain $30,000 more than the bank-appraised value of the Picards' property and in order to collect these monies against plaintiffs.

Plaintiffs' evidence shows the following activities of each of these individuals working together to achieve their common purpose of obtaining $30,000 by misrepresentations, concealment and false evidence:

(1) Mr. Picard misrepresented facts to circumvent the bank's appraised value of the property at the meeting on the Saturday in between May 12-19, 1994 (Ex. 1, Egbarin Aff. ¶ 17);

(2) Lewis and Lewis Lewis drafted the Amended Agreement in consultation with Mr. Picard to circumvent the appraised value of the property (Ex. 13);(Ex. 3, Lewis Dep. Trans. PP. 64-65, & 134); (Ex. 1, Egbarin Aff. ¶¶19, 20 & 21); (Pls' 56a(a) 2 Statement, ¶14);

(3) Lewis and Lewis Lewis drafted the second mortgage documents which he concealed from the bank, (Ex. 1, Egbarin Aff. ¶ 23); (Pls' 56(a) 2 Statement, ¶¶19 & 20);

(4) Mrs. Picard signed the HUD-1 (Ex. 16) knowing she misrepresented the consideration she received for the property; (Pls' 56a(a) 2 Statement, ¶26);

(5) All the defendants concealed second mortgage documents from the bank, (Ex. 2, Borrelli Rep P. 4); (Pls' 56(a) 2 Statement, ¶20);

(6) Lewis and Lewis Lewis recorded the second mortgage documents in Bloomfield Lands Records office, (Ex. 2, Borrelli Rep P. 3); (Ex. 4, Borrelli Dep. Trans. PP 7, 22 & 46);

(7) all defendants commenced collection actions and filed grievance charges to compel the plaintiffs to pay the Picards the $30,000 second mortgage. (Ex. 1, Egbarin Aff. ¶¶29, 37, & 49);

(8) Mr. Picard and Mrs. Picard signed all the false affidavits, (Ex. 21, Ex. 22, Ex. 34);

(9) Lewis and Lewis Lewis prepared and submitted all the false affidavits in court, (Ex. 1, Egbarin Aff. ¶¶30 & 44);

(10) Lewis made false statements to courts, (Ex. 1, Egbarin Aff. ¶¶32, 34, 35, 38 49 & 50); (Ex. 24 at p. 3) & (Ex. 29, at PP 22-25.);

(11) Lewis filed false grievance charges in consultation with the Picards, (Ex. 31); (Ex. 33, Griev. Trans. P 32) and;

(12) Lewis and Mr. Picard gave false testimonies in courts, (Ex. 1, Egbarin Aff. ¶50); (Ex. 35).

These activities of this informal organization establish the existence of a RICO enterprise.

17

The defendants next claim that the Lewis defendants' activities were nothing more than the provision legal advice or services.

Plaintiffs respectfully submit that the activities of Lewis and Lewis Lewis went beyond providing legal advice or services. See, <u>Cadle v. Flanagan</u>, No. 3:01-CV-531(AVC), at PP 24-25, (D. Conn. May 2, 2005), (a copy is attached herewith) citing, <u>citing Madanes v. Madanes</u>, 981 F. Supp.241, 259 (S.D.N.Y. 1997), where Covello, J, determined that the attorney's conduct in that case went beyond the rendering of legal services.[1] Lying to Judges has never been considered the provision of legal services[2].

Lewis' conduct here which includes multiple misrepresentations, concealing material facts from Sanborn and its closing attorney, recording illegal deed, submitting multiple false affidavits in court and giving false testimonies and deposition is more egregious than the attorney's conduct in the <u>Cadle</u> case.

---

[1] The attorney in that case told his client to disregard court order; assisted his client hide his client's assets; undermined court order; filed false documents in court and; made false statements to the court.

[2] Attorneys have been reprimanded or disbarred for lying to the court. See, e.g. <u>Statewide Grievance Committee v. Friedland</u>, 222 Conn. 131, 138, 609 A.2d 645 (1992) (Affirming Judge Freed's disbarment of attorney for lying to court.); <u>Daniels v. Alander</u>, 268 Conn. 320, 844 A.2d 182 (2004) reprimanding attorney for not correcting his partner's false statements to judge). Judge Freed in the <u>Picard v. Egbarin</u>, (Superior Court, Hartford, Docket # CV95-0548380, 1996), promised to disbar attorney if it turns out that the representations to the court are false. See, Ex. 29 at P. 25. Lewis' representations to Judge Freed that day turned out to be false. See, supra

Plaintiffs submit that the Lewis defendants conduct implicates them in this RICO enterprise.

### 2. **Defendants' conducts constitute a pattern of racketeering activity**

"Racketeering activity is defined in RICO to mean 'any act or threat involving' specified state-law crimes, any 'act' indictable under various specified federal statutes, and certain federal offenses." H.J. Inc. V. Northwestern Bell Tel. Co., 492 U.S. 229, 232, 109 S.Ct. 2893 (1988). RICO further defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" committed within a 10 year period. 18 U.S.C. § 1961(5); see, Azrielli v. Cohen Law Offices 21 F.3d at 520 (2nd Cir. 1994). To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are "related, and that they amount to or pose a threat of continued criminal activity." See H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989).

The continuity necessary to prove a pattern can be either "closed-ended continuity," or "open-ended continuity." See id. at 239, 241.

19

To satisfy closed-ended continuity, the plaintiff must prove "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months . . . do not satisfy this requirement." Id. at 242. Since the Supreme Court decided H.J., Inc., the second circuit has never held a period of less than two years to constitute a "substantial period of time." See GICC Capital Corp. v. Technology Finance Group, Inc., 67 F.3d 463, 467 (2d Cir. 1995); see also Metromedia Co. v. Fugazy, 983 F.2d 350, 369 (2d Cir. 1992) (finding closed-ended continuity when predicate acts occurred over a period of two years); Jacobson v. Cooper, 882 F.2d 717, 720 (2d Cir. 1989) (finding closed-ended continuity when predicate acts occurred over a "matter of years"). Other circuits have similarly held. See GICC Capital Corp., 67 F.3d at 468 (collecting cases).

The defendants' predicate acts first occurred on the Saturday in between May 12 and May 19, 1994, when Mr. Picard made misrepresentations to the plaintiff to induce the plaintiffs to give the Picards a second mortgage of $30,000. (**Ex. 1**, Egbarin Aff. ¶ 17). multiple predicate acts occurred as described above in the list of defendants' racketeering activities. See, e.g., **Ex. 1**, Egbarin Aff. ¶¶21, 25, 26, 30, 33, 36, 39, 40-46 & 51.