The defendants' predicate acts continued through March 1999 when Lewis and Mr. Picard testified at the presentment hearing and until the court issued and mailed the judgment suspending Mr. Egbarin's law license on June 22, 1999.

Lewis however, continued to misrepresent when he made false statements in his deposition on March 25, 2005. **Ex. 3**, Lewis Dep. Trans. PP 149-153, 172-173, 175.

Within the twelve (12) different and coordinated racketeering activities described which began in May 1994 and continued to June, 1999, were at least sixteen (16) predicate acts of mail fraud; at least two (2) predicate acts of wire fraud; at least one (1) predicate act of bank fraud and; at least nine (9) predicate acts of obstruction of justice. (**Ex. 1**, Egbarin Aff.); (Pls' 56(a) 2 Statement, ¶¶17, 19 22, & 23).

Plaintiffs' evidence clearly shows a series of more than two related predicate acts that extended for more than two years.

### 3. Defendants executed three (3) mail fraud schemes.

In order to prove a violation of the mail fraud or wire fraud statute, 18 U.S.C. § 1341 and § 1343 respectfully, the plaintiffs must prove that the defendant (1) participated in a scheme to defraud (2) with money or property as the object of

21

the scheme, and (3) use of the mail or wires in furtherance of the scheme. United States v. Dinome, 86 F.3d 277, 283 (2d Cir. 1996).

Further, the plaintiff must "show that the scheme was devised with the specific intent to defraud. . . that the use of the mails [or wires] in furtherance of the scheme was reasonably foreseeable, . . that . . . non-disclosures or affirmative misrepresentations [were] material, . . [and] that some actual harm or injury was at least contemplated." United States v. Rodolitz, 786 F.2d 77, 80 (2d Cir. 1986)(quoting United States v. Bronston, 658 F.2d 920, 927 (2d Cir. 1981)).

The defendants devised three schemes.

**Purchase-Price-Fraud Scheme**

In the first scheme, the Purchase-Price-Fraud Scheme, Mr. and Mrs. Picard obtained, through misrepresentations, $30,000 more than the lending bank appraised the Picards' property. The Picards obtained the $30,000 in the form of a promissory note and mortgage deed for $30,000 which they concealed from the bank. (**Ex. 1**, Egbarin Aff. ¶¶17, 23-26); (Pls' 56(a) 2 Statement, ¶14).

Under this purchase-price-fraud scheme, the defendants planned to and received the $30,000 cash they were holding in

escrow, **(see Ex. 11)**, and then another $300,000 in the form of the $270,000 loan from Sanborn **(Ex. 12)** and the Statutory mortgage and promissory note for $30,000, **(Ex. 14, Ex. 15)**, for a total consideration or purchase price of $330,000. **(Ex. 1,** Egbarin Aff. ¶17); **(Ex. 4,** Borrelli Dep. Trans. pp. 31-32, 40 and 45); **(Ex. 2,** Borrelli Rep. P 4).

At the closing on May 31, 1994, the plaintiffs obtained a mortgage loan of $270,000 from Sanborn and used the $30,000 cash in escrow **(Ex 11, Escrow)**, as the cash down payment for the property. **(Ex 6,** Gilligan Dep. Trans. pp. 45-47). The Egbarins did not need an additional sum of $30,000 to close the transaction. **Ex. 16, HUD-1**); **(Ex. 10,** URAP); **(Ex 5,** Egbarin Dep. Trans. pp. 7, 100-101); **(Ex 6,** Gilligan Dep. Trans. pp. 38-39 and 96-97).

Nevertheless, at the closing, Lewis secretly presented the promissory note and statutory mortgage deed for $30,000 to Mr. Egbarin to sign. Lewis signed as a witness and did not give a copy of the promissory note and statutory mortgage deed for $30,000 to Mr. Egbarin at the closing. **(Ex. 1,** Egbarin Aff. ¶ 24).

Lewis never gave any copy of the second mortgage documents to Gilligan. **(Ex 6,** Gilligan Dep. Trans., pp. 28-30, 34-38, 47, 50 & 70-71); **(Ex. 2,** Borrelli Rep. p 4).

23

The $30,000 loan is not listed in the Hud-1 Settlement Statement. **(Ex. 16,** HUD-1); **(Ex 6,** Gilligan Dep. Trans., pp. 44-48 & 96-97); **(Ex. 4,** Borrelli Dep. Trans., pp. 22 & 67-69).

And neither the bank's attorneys' closing file nor the bank's file for the Egbarins contains any copy of this Statutory Mortgage Deed and Promissory Note for $30,000 **(Ex. 14 & Ex. 15)**. **(Ex 6,** Gilligan Dep. Trans. pp. 28-30, 34-38, 47, 50, & 70-71); **(Ex. 2,** Borrelli Rep. p 4); **(Ex. 4,** Borrelli Dep. Trans., pp. 38-40, & 69-71); **(Ex. 1,** Egbarin Aff. ¶47 & ¶48).

Lewis recorded the second mortgage documents in the lands Record office, in Bloomfield. **(Ex. 2,** Borrelli Rep. p 3); **(Ex. 4,** Borrelli Dep. Trans. pp. 7, 22 & 46)**. The Land Records office later sent confirmation documents by U.S mail to Lewis or Lewis, Lewis, concerning the second mortgage documents. **(Ex. 1,** Egbarin Aff. ¶26).

Lewis admitted he sent a copy of the Statutory Mortgage Deed and Promissory Note for $30,000 **(Ex. 14 and Ex. 15)** to the Egbarins. **(Ex. 3,** Lewis Dep. Trans. pp 152-153). The plaintiffs received a copy of the Statutory Mortgage Deed and Promissory Note for $30,000 (Ex. 14 and Ex. 15) from Lewis via U.S. mail. **(Ex. 1,** Egbarin Aff. ¶25).

Plaintiffs' expert opinion confirms that the defendants violated Residential Mortgage banking law, 18 U.S.C §1001

**(Ex.17),** when they concealed the second mortgage documents from the bank or its closing agent, Robert Gilligan of Mayo, Gilligan and Zito. **(Ex. 2,** Borrelli Rep. p 4); **See,** Plaintiffs' 56(a) 2 Statement, ¶ **20.**

## Collection-Fraud-Scheme

Subsequently, the defendants brought several petitions in the courts to collect the $30,000 promissory note and mortgage deed. In this second scheme, the Collection-Fraud-Scheme, defendants misrepresented to the courts and hid from the courts, the fact that the defendants violated residential mortgage law, 18 U.S.C, §1001, when defendants concealed the existence of the promissory note and statutory mortgage deed of $30,000 from the lending bank. **(Ex. 1,** Egbarin Aff. ¶¶31-35, 38, 45); (Pls' 56(a) 2 Statement, ¶¶32);(Pls' **Exs, 20-24,29 & 34).**

In December 1995, in the course of the foreclosure action plaintiffs received in the US Mail, two affidavits, one dated on December 1, 1995 and the other dated November 22, 1995. Also, in the papers these affidavits were attached, Lewis certified that he mailed these affidavits to the plaintiffs. These affidavits contain several lies about the transaction that took place on May 31, 1994. **(Ex. 1,** Egbarin Aff. ¶30 and ¶31).

25

On January 22, 1996 at a Hearing in this foreclosure action, Lewis lied to Judge Freed that the RESPA **(Ex.16)** lists the Statutory Mortgage Deed and Promissory Note for $30,000. **(Ex. 24,** PP. 3).

Lewis made false statements to Judge Freed. The $30,000 loan is not listed in the Hud-1, **(Ex. 16)**, **(Ex 6,** Gilligan Dep. Trans., pp. 44-48 & 96-97) and, Lewis never gave any copy of the second mortgage documents to the bank's closing attorney. **(Ex 6,** Gilligan Dep. Trans., pp. 28-30, 34-38, 47, 50 7 70-71**)**; **(Ex. 2,** Borrelli Rep. p 4);( **Ex. 4,** Borrelli Dep. Trans., pp 37-40).

In fact, there was never any copy and there is no copy of the second mortgage documents in the bank's file or in the bank's closing attorney's file. **(Ex 6,** Gilligan Dep. Trans., pp. 28-30,34-38, 47, 50, & 70-71); **(Ex 4,** Borrelli Dep. Trans., pp. 38-40, & 69-71).

Even Lewis admitted that the contents of the bank's file would only have come from the Closing file. **(Ex. 3,** Lewis Dep. Trans., p 151**)**. However, there was no copy of the second mortgage documents in the bank's file when plaintiffs subpoenaed the banks file for this matter or when the plaintiffs were supplied with a copy of the bank's file when Lewis subpoenaed these files in 1996, in respect of the PJR hearing in the New Britain superior court action. **(Ex. 1,** Egbarin, Aff. ¶47**)**.

And in fact, the bank was <u>never</u> <u>aware</u> <u>of</u> <u>existence</u> <u>of</u> <u>the</u> second mortgage <u>documents</u>. (**Ex 6,** Gilligan Dep. Trans., pp. 28-30,34-38, 47, 50, & 70-71); **(Ex. 2,** Borrelli Dep. Trans., pp 37-39, 44-45 & 70-71).

On July 15, 1996, in another hearing before Judge Freed in this same action, Lewis once again lied to Judge Freed that lines 201 and 506 of the HUD-1 **(Ex.16)** list his clients' loan for $30,000. Lewis also lied that he fully disclosed the second mortgage documents to the bank. **(Ex. 29,** Court Transcript PP 22-25).

In February 1996, during a hearing on the second action in New Britain Superior Court for a prejudgment remedy attachment, "PJR," **(Ex. 23),** Lewis hid from the court the fact that the $30,000 debt he was trying to collect was concealed from the bank on May 31, 1994. Lewis lied to the court and said the $30,000 debt was the down payment for the closing on May 31, 1994. **(Ex. 1,** Egbarin Aff. ¶38).

In April 1998, Plaintiffs received in the U.S mail another affidavit dated April 24, 1998 **(Ex. 34)** in this PJR action. This affidavit of April 24, 1998 also falsely stated that the Picards "transferred [the property to the plaintiffs] for the sum of $300,000 of which $270,000 came from the [] loan with Sanborn

and $30,000 was by way of the note (Ex. 14 and Ex. 15)..." **(Ex. 34)**.

This and the previous affidavits are clearly false because the Picards received $330,000 as the consideration for the property. **(Ex. 2, Borrelli Rep. p 4)**. But the certified statement in the HUD-1 states that the purchase price was $300,000 of which $270,000 came from Sanborn's loan and the balance $30,000 was by way of "cash" not a note or mortgage. **(Ex 6,** Gilligan Dep. Trans. p 48); **(Ex. 4,** Borrelli Dep. Trans. pp 41 & 64-65**)**.

**Retaliatory Grievance Scheme**

Finally, in the third scheme, the Retaliatory Grievance Scheme, defendants filed false grievance charges and misrepresented facts in grievance proceeding for the purpose of suspending the plaintiff's law license and damaging plaintiffs' business and property in retaliation for the plaintiffs' refusal to pay the $30,000 defendants tricked plaintiffs to give. See, The Purchase Price Fraud Scheme, above. See, also, **(Ex. 1,** Egbarin Aff. ¶49-50); (Pls' 56(a) 2 Statement, ¶¶32, 33 & 35) ; ( Pls' **Exs, 31, 33, 35 & 36)**.

On February 13, 1997, Lewis and the Picards immediately filed grievance charges against Mr. Egbarin after Lewis was

28

told, according Lewis, that Mr. Egbarin did not file his tax returns for 1992 and 1993.(**Ex. 33**, Griev. Trans. P. 32-33). At the time, defendants were unable to seize substantial assets from the plaintiff's law practice.

Before Lewis filed grievance charges against Mr. Egbarin, Lewis told Mr. Egbarin that if Mr. Egbarin did not pay the $30,000 plus his attorney's fees that he would report Mr. Egbarin to the bar because, according to Lewis, Mr. Egbarin signed papers stating there were no junior financing when there was one. Mr. Picard also threatened to assault Mr. Egbarin in Lewis office during Mrs. Egbarin's deposition on September 21, 1995 in Lewis' office if Mr. Egbarin did not pay the $30,000. (**Ex. 1**, Egbarin Aff. ¶49).

Lewis later stated he was going to teach Mr. Egbarin a lesson. Lewis told the court in the PJR hearing that Mr. Egbarin was engaged in money laundering. Lewis also told Mr. Egbarin he was going to teach people like Mr. Egbarin a lesson and put Mr. Egbarin in his place. (**Ex. 1**, Egbarin Aff. ¶49); (**Ex 24**, P. 4).

In March 1997, Lewis filed amended grievance charges where he fully explained that plaintiffs' bankruptcy lawyer told him in the course of the bankruptcy that Mr. Egbarin did not file his tax returns for 1992 and 1993. **(Ex 31)**.

Lewis also testified that he relied on hearsay statement to form his decision to file grievance charges against the plaintiff. (**Ex. 33**, Griev. Trans. pp 32-33).

These charges were dropped. (**Ex. 1**, Egbarin Aff. ¶49). Lewis had no supporting facts and did not even call as a witness, plaintiffs' bankruptcy lawyer who told him that Mr. Egbarin did not file his tax returns with the IRS. (**Ex. 1**, Egbarin Aff. ¶49). The grievance panel found that the plaintiffs' tax returns were filed with the IRS. (**Ex. 33**, Griev. Trans. pp 22-24). However, the grievance committee claimed a new theory for the presentment before Judge Berger. (**Ex. 35**, Grievance Committee v. Egbarin), (Conn. Super, docket # CV98-0585474S, June 22, 1999).

In March 1999, Lewis and Mr. Picard testified extensively at the presentment hearing and the court relied exclusively on the submissions and testimonies of Lewis and Mr. Picard. **(Id, at PP. 8-11)**. On appeal, the appellate court concluded that the testimonies were sufficient since it was the prerogative of the court to determine what weight, if any, to give to the testimony of Picard and Lewis. Grievance Committee v. Egbarin, 61 Conn. App. 445, 459, 767 A.2d 732, (2001), cert. denied 255 Conn. 949, 769 A.2d 64(2001).

The new evidence now shows that the testimonies of Lewis and Mr. Picard were not credible. The new evidence establishes that Lewis lied several times to Judge freed in the collection actions, (Plaintiffs' 56(a) 2 Statement, **¶¶22 & 27**). Mr. Picard received monies from the plaintiffs, (**Ex. 37**, at #75 & **Ex. 38** at #89), but in the affidavits filed in court (**Ex. 21** & **Ex. 34**), Mr. Picard falsely swore he did not receive any monies from the plaintiffs.

Also, the new evidence shows Mr. Picard filed false tax returns in 1993 and 1994 when he reported receiving only $300,000 instead of $330,000 and when he failed to include the $30,000 cash escrow as income. (**Ex. 37** & **Ex. 38**, 1993 and 1994 Tax Returns); (**Ex. 19**, Substitute 1099S Form); **See** (Plaintiffs' 56(a) 2 Statement **¶¶18, 20, 22 & 23**). (**Ex. 2**, Borrelli Dep. Trans. PP. 71-73).

Furthermore, Lewis and Mr. Picard lied when they testified at the presentment hearing that the plaintiffs gave them plaintiffs' 1992 and 1993 tax returns for a mortgage application process that never existed. (**Ex. 3** Lewis Dep. Trans. pp 98-100); (**Ex. 1**, Egbarin, Aff. ¶50).

Thus, as fully described above, the defendants participated in these three schemes to defraud with money or property as the object of the schemes.

31

In furtherance of these schemes, the defendants sent and received documents using the US mail and caused documents from the courts, the Bloomfield land records office, Sanborn, and the bank's attorney to be sent in the US mail. **Ex. 1,** Egbarin Aff. ¶¶21, 25, 26, 30, 33, 36, 39, 40-46 & 51); (Pls' 56(a) 2 Statement, ¶¶19, 22, 23 & 24).

Plaintiffs' evidence clearly shows the existence of three schemes the defendants knowingly participated in while using the U.S. mail in furtherance of the schemes.


### 4. Defendants executed a wire fraud scheme.

The collection fraud scheme described above in the mail fraud section is incorporated here and applies here. (**Ex. 1,** Egbarin Aff. ¶¶31-35, 38, 45); (Pls' 56(a) 2 Statement, ¶¶32);(Pls' **Exs, 20-24,29 & 34).**

In addition, the defendants caused the courts to send documents in interstate wire to out-of-state banks where the plaintiff maintained credit card accounts. (**Ex. 27); (Ex. 1,** Egbarin Aff. ¶42).

Plaintiffs' evidence clearly shows the existence of one collection fraud scheme where the defendants knowingly participated in using the interstate wires in furtherance of the scheme.

32

## 5. Defendants executed a bank fraud scheme

The purchase price fraud scheme which is fully described in the mail fraud section applies here and is incorporated here by reference. (**Ex. 1**, Egbarin Aff. ¶¶17, 23-26); (Pls' 56(a) 2 Statement, ¶14).

18 U.S.C. §1344 provides:

Whoever knowingly executes, or attempt to execute, a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of a false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

Mr. and Mrs. Picard signed and sent a document (**Ex. 11**), to Sanborn to verify that they received the $30,000 cash deposit that was to be used as the down payment for the closing. (**Ex. 1,** Egbarin Aff. ¶14).

The defendants prepared an Amendment Agreement, (**Ex. 13**), (**Ex. 1,** Egbarin Aff. ¶¶19, 20, 21 and 22) which, they claim "reclassified" the cash escrow as "rent." (Ex. 3, Lewis Dep. Trans. PP 64-65.

But the defendants did not tell Sanborn the cash escrow should not be used as the down payment or that the second mortgage would be the down payment. (**Ex. 37,** Mrs. Picard

33

Admission, #75); (**Ex. 38,** Mr. Picard Admissions, #89). Neither did Lewis tell anyone at Sanborn that there was a change of plans and the second mortgage was now going to be the down payment. (**Ex. 3,** Lewis Dep. Trans. P 143, line 23 to P. 144 line 1). Defendants <u>concealed</u> the second mortgage documents from the bank. (Ex. 14 and Ex. 15). <u>See</u>, Pls' 56(a) 2 Statement, ¶20.

The concealment of the second mortgage documents violated 18 U.S.C §1001[3], and therefore defendants defrauded the bank in violation of 18 U.S.C. §1344.

The essential elements to prove a §1001 concealment are (1) the defendants knowingly concealed a fact by any trick, scheme, or device; (2) the defendants acted willfully;(3) the fact concealed was material; (4) the subject matter involved was within the jurisdiction of a department or agency of the United States; and (5) the defendant had a legal duty to disclose the fact concealed. 18 U.S.C §1001. <u>U.S v. Kingston</u>, 971 F. 2d 481, 489, (10th Cir. 1992).

The evidence in the record clearly establishes these elements. Pls' 56(a) 2 Statement, ¶20.

Plaintiffs' fraud expert concluded "[t]hese instruments were not provided to the lender nor to its closing agent [,]" and the "failure to disclose the second mortgage on the

settlement statement was a material misrepresentation of the transaction." **Ex. 2,** Borrelli Rep. p 4.

Lewis admitted he was representing Mr. and Mrs. Picard and brought these instruments to the closing (**Ex. 3,** Lewis Dep. Trans. pp 146 & 149). As the attorney for the sellers, Lewis had a duty to disclose these instruments to the bank's attorney for listing on the Settlement Statement which his clients signed and certified was true and accurate. See HUD-1 **(Ex. 16)**. Lewis breached this duty as he never disclosed these instruments to the bank.

Accordingly, the evidence[4] supports a reasonably conclusion that the defendants violated 18 U.S.C. §1344.

### 6. Defendants' conducts in the state courts constitute obstruction of justice under the RICO statute

The collection fraud scheme, (**Ex. 1,** Egbarin Aff. ¶¶31-35, 38, 45); (Pls' 56(a) 2 Statement, ¶¶32); (Pls' **Exs, 20-24,29 & 34)**, and the Retaliatory grievance scheme, (**Ex. 1,** Egbarin Aff.

---

[3] 18 U.S.C. §1001 is pre-printed on the HUD-1, Ex. 16 and the principal mortgage loan was issued by a federally regulated bank, Mechanics Savings Bank.

[4] Plaintiffs' need only show that their injury must have been proximately caused by a pattern of racketeering activity violating 18 U.S.C §1962 or by individual RICO predicate act. Lerner v. Fleet Bank N.A, 318 F. 3d 113,, 122-23, (2d Cir. 2003). Although this issue is not raised by the defendants, except in passing, the plaintiffs can establish that their injuries were caused by the defendants' pattern of racketeering activity. Plaintiff's economic expert has testified that the courts' interventions in the plaintiffs law practice, occasioned by the defendants' actions, caused $1,290,632 to $2,328, 445 in lost income to the plaintiffs. Ex. 43, Report of Economic Expert, Sheldon Wishnick, "Wishnick Rep.," at p.1 and second page, dated January 27, 2005.

35

¶49-50); (Pls' 56(a) 2 Statement, ¶¶32, 33 & 35);(Pls' **Exs, 31, 33, 35 & 36)**, which are fully described in the mail fraud section above, apply here and are incorporated here by reference.

18 U.S.C. § 1503 provides, in relevant part, that:

Whoever... corruptly... endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5000 or imprisoned not more than five years, or both.

The defendants base their challenge of this claim on O'Malley v. New York City Transit Authority, 896 F.2d 704 (2d Cir. 1990). However, O'Malley addressed a different clause of the statute and is not relevant to this claim.

The second Circuit noted that the omnibus clause of 18 U.S.C. § 1503, upon which plaintiffs claim is based, does not even mention federal jurisdiction and held that the 'existence of an ongoing proceeding is an element of a § 1503 violation,' as is the intent to impede the administration of justice, the statute does not require a specific intent to interfere with a proceeding known by the defendant to be federal in nature. United States v. Ardito, 782 F.2d358 (2d Cir. 1986). (citation omitted)(emphasis supplied).

Congress did not mention federal jurisdiction in the omnibus clause and the second Circuit has refused to add to the

36

statute, in the absence of Congressional intent to the contrary. Id at 361.

The evidence shows that the defendants lied, submitted false evidence and gave false testimonies in the course of the court proceedings in Hartford Superior Court, New Britain Superior Court and the grievance Presentment in the Hartford Superior Court. Pls' 56(a) 2 Statement, ¶¶ 22, 23, 24, 35 and even 40).

Based on these misrepresentations and concealment, the defendants succeeded in enforcing the promissory note and statutory mortgage for $30,000 (Ex. 14 and Ex. 15), which were obtained in violation of 18 U.S.C, §1001. Plaintiffs' expert confirms that the defendants procured these instruments through misrepresentation and concealment. Ex. 2, Borrelli Rep. P. 4; Pls' 56(a) 2 Statement, ¶20.

Absent these misrepresentations and concealment, the courts would not have enforced these instruments because a contract or instrument made in violation of a statute is illegal and unenforceable, and it is usually immaterial whether the thing forbidden by statute is malum in se or mallum prohibitum. Couldock & Bohan v. Societe Generale Sec. Corp., 93 F. Supp 220, (D. Conn. 2000).

The defendants knew the evidence they submitted to court was false and intended to "teach a lesson" to Mr. Egbarin and to impound his law license by all means. **(Ex. 1,** Egbarin Aff. 49).

Accordingly, the plaintiffs evidence supports a reasonably conclusion that the defendants violated 18 U.S.C. §1344.

### 7. Plaintiffs' RICO claim is Timely

The plaintiffs' RICO claim is not barred by the RICO statute of limitations.

The Supreme Court announced a uniform four-year statute of limitations period for civil RICO actions..." Bingham v. Zolt, 66 F.3d 553,559, (2d Cir. 1995) citing Agency Holding Corp. V. Malley-Duff & Assocs., 483 U.S. 143, 156-57 (1987) and rejected the theory that the plaintiff must discover both a RICO injury and a pattern of RICO activity before the RICO statute of limitations begins to run. Rotella v. Wood, 528 U.S. 549, 553-54 (2000).

The statute of limitations begins to run when the plaintiff discovers or should have discovered his injuries. In re Merrill Lynch Ltd. P'ships Litig, 154 F. 3d 56, 58 (2d Cir. 1998). Also, the second circuit recognizes a "separate accrual" rule under which new claim accrues, triggering a new four-year limitations period, each time plaintiff discovers or should have discovered,

38

a new injury caused by the predicate RICO violations. Bingham v. Zolt, 66 F.3d 553, 559, (2d Cir. 1995) citing Cruden v. Bank of New York, 957 F. 2d 961, 977 (2d Cir. 1992); Bankers Trust Co. v. Rhoades, 859 F. 2d 1096, 1102 (2d Cir. 1988).

"As long as separate and independent injuries continue to flow from the underlying RICO violations—regardless of when those violations occurred—plaintiff may wait indefinitely to sue, but may then win compensation only for injuries discovered or discoverable within the four-year 'window' before suit was filed, together, of course, with any provable future damages." Bingham, 66 F. 3d at 560, citing Bankers Trust, 859 F.2d at 1103.

Contrary to defendants' argument, the RICO statute of limitations does not begin to run when a plaintiff discovers both his RICO injury and his RICO claim. Rotella v. Wood, 528 U.S. 549, 553-54 (2000). Thus, the defendants' argument concerning when plaintiffs discovered their RICO claims is irrelevant.

What is relevant is when did plaintiffs' injury occur?

Plaintiffs sustained these relevant injuries that were caused by defendants' pattern of racketeering activity: (1) on March 4, 1996, when court order froze and garnished plaintiffs' assets (**Ex. 26**); (2) on October 30, 1996, when court order froze

and garnished plaintiffs' assets (**Ex. 27**); (3) on April 7, 1997, when court order froze and garnished plaintiffs personal injury cases (**Ex. 32**); (4) on July 2, 1998, when court order garnished and froze plaintiffs personal injury cases (Ex. 44); (5) on September 8, 1998, when court order foreclosed plaintiffs house at 8 Northcliff Drive, Bloomfield (**Ex. 45**) and; (6) on June 22, 1999, when court order suspended plaintiff' law license (**Ex. 35**).

Accordingly, the plaintiffs evidence supports a reasonably conclusion that the plaintiffs' RICO claim which was initiated on May 23, 2000 was timely for the injuries that occurred after May 24, 1996 at the latest.


**B.  FDCPA**

> **1. Defendants, Lewis and Lewis Lewis are debt collectors under the FDCPA.**

FDCPA applies to attorneys "regularly" engaging in debt collection activity, including such activity in the nature of litigation. <u>Hientz v. Jenkins</u>, 514 U.S. 291, 299 (1995) quoted in *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56, 60 (2d Cir. 2004

The Second Circuit in *Goldstein*, set forth an analytical framework and guidance for determining who qualifies as a "debt collector" under the FDCPA.

40