Most important in the analysis is the assessment of facts closely relating to ordinary concepts of regularity, including (1) the absolute number of debt collection communications issued, and/or collection-related litigation matters pursued, over the relevant period(s), (2) the frequency of such communications and/or litigation activity, including whether any patterns of such activity are discernable, (3) whether the entity has personnel specifically assigned to work on debt collection activity, (4) whether the entity has systems or contractors in place to facilitate such activity, and (5) whether the activity is undertaken in connection with ongoing client relationships with entities that have retained the lawyer or firm to assist in the collection of outstanding consumer debt obligations. Goldstein, 374 F.3d at 62-63.

Here the Lewis testified that he and his law firm did <u>all</u> the real estate closing and foreclosure collection work for the predecessor of Webster bank for the period beginning in 1981 until 1996. **(Ex. 3,** Lewis Dep. Trans., pp 40-41).

Also, as recently as February 14, 2005, Lewis and his firm, Lewis, Lewis advertised online that they represented major corporate mortgage bank creditors, including, Sanborn Corporation, American Home Mortgage, Inc., Bristol Mortgage Corporation, Webster bank, Great Western Mortgage Co.,. Metro Mortgage Corp., and other such mortgage, credit and mortgage debt collections companies. **(Ex. 39,** Print-out from the online website of Lewis, Lewis as of 2/14/05).

Lewis admits that his office handled foreclosure collection work until Webster Bank took over Eagles Savings bank in 1996. **(Ex. 3,** Lewis Dep. Trans., pp 40-41).

Lewis defendants are debt collectors for the relevant period, which is 1995 when they commenced their collections

41

activities against the plaintiffs on March 17, 1995. (**Ex. 20**); (**Ex. 1**, Egbarin Aff. 29).

Lewis and Lewis Lewis did collection-related litigation matters for their bank client during the period defendants brought collection actions against the plaintiffs. According to Lewis, his firm did all the foreclosure collections for the Eagles Savings bank but he was not the "lead counsel," meaning that the system in place to service Eagle Savings Bank involved other personnel in the office who were specifically assigned to work on Eagle Savings Bank foreclosure collections work. (**Ex. 3**, Lewis Dep. Trans., pp 40-41).

Lewis and Lewis Lewis' collection activities were undertaken in connection with ongoing client relationships with entities such as Eagle Savings Bank and the other entities listed on the website of Lewis, Lewis. (See Ex. 39, online print-out). As such, under the second circuit framework for analyzing this issue, The Lewis defendants are debt collectors. Also see, <u>Silva v. Mid Atlantic Management Corp</u>., 277 F. supp. 2d 460 (E.D. Pa. 2003)

Plaintiffs' evidence clearly shows that the Lewis defendants are debt collectors.

## 2. Plaintiffs' FDCPA claim is not barred by the doctrines of Res Judicata, Collateral Estoppel or Privilege.

Contrary to defendants' argument, the plaintiffs' FDCPA claim in this matter is not the same as the defenses plaintiffs filed in the Picard defendants' collection actions in Hartford court and in New Britain court. The parties are not the same. The Lewis defendants were not parties in those prior actions. The defendants' corruption in the collection lawsuits in 1995 to 1999 is not the same corruption by the defendants in the closing transaction in 1994. See, Silva, 277 F. Supp. 2d at 468.

Assuming collateral estoppel or res judicata could bar the plaintiffs' FDCPA claim based on the New Britain Court judgment, these doctrines do not bar the FDCPA claim based on the judgment that suspended plaintiffs' license. Defendants used the grievance process as a means to compel defendants to pay the debt. **(Ex. 1,** Egbarin Aff. 49); **(Ex. 33.** P. 6).

The plaintiffs did not and could not raise these defenses in the grievance process which the defendants used as a means to compel plaintiffs to pay the $30,000 debt. **(Ex. 1,** Egbarin Aff. 49). FDCPA claims were not barred since they could not have been asserted in the state landlord-tenant proceeding. See Cousins v. Duane St. Assoc., 2001 US App. Lexis, 5645 (2nd Cir. April 2,

2001), citing Peterson v. United Accounts, 638 F.2d. 1134 (8th Cir. 1981).

Furthermore there is no privilege protection for lies, submitting false evidence and misrepresentations in court. See, Cadle v. Flanagan, No. 3:01-CV-531(AVC), at PP 24-25,(D. Conn. May 2, 2005). Lawyers have been reprimanded or disbarred for telling misrepresenting and concealing facts in court or submitting false evidence. See, note 2, infra at page 18.

### 3. Plaintiffs' FDCPA claim is Timely

The defendants engaged in a series of continuing collection abusive practices that began with a campaign to "teach" Mr. Egbarin "a lesson" and with the filing of the complaint on March 17, 1995 (Ex. 20). The defendants' abusive collection activities continued until November 2000, when the plaintiffs filed for bankruptcy. (**Ex. 1**, Egbarin Aff. 52).

In spite of their denials, defendants used the attorney grievance process as means to collect the $30,000 debt. The defendants' charges, based on hearsay were dropped. Defendants filed grievance charges against Mr. Egbarin to compel payment of the $30,000 debt defendants were attempting to collect. (**Ex. 1**, Egbarin Aff. ¶49).

On September 10, 1997, 7 months after Lewis filed grievance charges against Mr. Egbarin, a member of the grievance committee had to remind Lewis that the grievance process was not meant to be used for collection. The committee member said: "I just want to make one thing clear, we are here involving a grievance against a lawyer. We are not a substitute, nor do we lend ourselves to any claims, any court claims for any recovery of monies, and we don't handle anything with recovery of monies..." **Ex. 33**, Griev. Trans. P. 6).

The record shows that the defendants used the attorney grievance process as a strategic means to collect the $30,000 debt. Defendants' collection strategy achieved its goal which is either Mr. Egbarin pays the debt or Mr. Egbarin would be disbarred. A court judgment on June 22, 1999 suspended Mr. Egbarin's law license as a result of the defendants' collection activities. **(Ex. 35)**.

Defendants admit, and plaintiffs concede, that the latest date by which a claim could have accrued would be the date judgment entered after a collection complaint was filed. (Def. Memo. at P 28). Defendants admission here is consistent with the ruling in Kouabo v. Chevy Chase Bank, F.S.B., 336 F. Supp. 2d 471 (D. Md. 2004), where the court held that the violation under

45

FDCPA occurred when judgment was entered. Id at 336 F. Supp. 2d P. 475.

In this case, the campaign to teach Mr. Egbarin a lesson and to harass and abuse the plaintiffs was continuing violation that resulted in Mr. Egbarin's suspension from the practice of law. As defendants put it, [defendants' grievance] complaint ultimately resulted in Mr. Egbarin's disbarment," (Def. Statement of Undisputed facts, ¶35), on June 22, 1999. Beyond this date, Lewis contacted plaintiffs, through plaintiffs' bankruptcy attorney, regarding the debt, in November, 2000.

Therefore, the FDCPA claim filed on May 23, 2000 was timely.

## C. FRAUD

Plaintiffs hereby consent to the dismissal of the Fraud claim for the sake of judicial economy.

## D. INFLICTION OF EMOTIONAL DISTRESS

### 4. Plaintiffs state claims of Intentional and Negligent Infliction of Emotional Distress.

Defendants' specific challenge of plaintiffs' intentional and negligent emotional distress claims is that the defendants' conduct is that a reasonable person can not

46

exclaim "outrageous," when they hear the facts. See, Def. Memo., at P. 29.

In Connecticut, the elements of a claim for intentional infliction of emotional distress are: (1) that the defendants intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of their conduct; (2) that the conduct was extreme and outrageous; (3) that the defendants' conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. Petyan v. Ellis, 200 Conn. 243, 253 (1986). "Liability for intentional infliction of emotional distress requires 'conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.'" DeLaurentis v. City of New Haven, 220 Conn. 225, 266 (1991)(quoting Petyan, 200 Conn. at 254 n.5). In the instant motion, defendants challenge only the plaintiff's ability to prove causation.

Courts have found in the following cases, "extreme and outrageous" conduct: Grossman v. Computer Curriculum Corp., 131 F.Supp.2d 299, 310 (D. Conn. 2000) (alleging defendant severely harassed and mistreated plaintiff); Caesar v. Hartford Hospital, 46 F.Supp.2d 174, 180 (D. Conn. 1999) (allegations of

47

discrimination and false reports made for the malicious purpose of retaliation); <u>Talit v. Peterson</u>, 44 Conn. Supp. 490, 498, 692 A.2d 1322 (1995) (alleging defendants caused her to lose her employment in retaliation for filing a grievance); <u>Decampos v. Kennedy Center Inc.</u>, No. CV89 0260290 S, 1990 WL 264687, *3 (Conn. Super. 1990) (alleging defendant intentionally made false statements about her job performance with malice).

Here, defendants were determined to collect $30,000 so they promised to teach plaintiffs a lesson. (**Ex. 1**, Egbarin Aff. 49); (**Ex. 24**, Hearing Trans. P. 4).

Defendants began the campaign to teach plaintiffs a lesson by harassing and abusing the plaintiffs on a weekly basis in 1995, 1996, 1997 and 1998. Defendants brought two lawsuits and one grievance action in collecting an illegal $30,000 debt. The defendants caused the plaintiffs to file two bankruptcy protection petitions in 1996 and in 2000; the loss their home in a 1998 foreclose; the loss of plaintiffs' business in 1999. (**Ex. 1**, Egbarin Aff. 51).

In the process defendants made several misrepresentations, concealed material facts and, submitted false evidence in order to obtain court orders to garnish plaintiffs' assets, bank accounts and business. (**Ex. 1**, Egbarin Aff. 49); (Pls' 56(a) 2 Statement, ¶¶ 22, 23, 24, 35 and even 40).

48

Defendants filed false grievance charges in retaliation for plaintiffs' refusal to pay the $30,000 debt. (Pls' 56(a) 2 Statement, ¶35). When it became apparent that these were false charges, defendants came up with new charges that were based solely on their false testimonies. (Pls' 56(a) 2 Statement, ¶35); **(Ex. 35)**.

As part of the campaign to assassinate Mr. Egbarin's character, Lewis told the court in a garnishment hearing that Mr. Egbarin was engaged in "money laundering." Lewis has yet to produce the facts for that charge. (**Ex. 1,** Egbarin Aff. 49).

The evidence shows that the defendants lied, submitted false evidence and gave false testimonies in the course of the court proceedings in Hartford Superior Court, New Britain Superior Court and the grievance Presentment in the Hartford Superior Court. Pls' 56(a) 2 Statement, ¶¶ 22, 23, 24, 35 and even 40). All of these were done not only to collect an unenforceable debt, but to "teach" Mr. Egbarin "a lesson" for resisting collection.

The record shows that the defendants intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of their conduct. Defendants' conduct was extreme and outrageous and the cause of the plaintiffs' severe emotional distress.

49

As for the claim for Negligent infliction of emotional distress, the record shows that the defendants' conduct as described here created an unreasonable risk of causing emotional distress and the emotional distress was foreseeable. Defendants conduct caused of the plaintiffs' severe emotional distress.

### 5. **Plaintiffs' claims of Intentional and Negligent Infliction of Emotional Distress are Timely**

The plaintiffs' Intentional infliction of emotional distress claims and the Negligent infliction of emotional distress are timely.

The claims were initiated on May 23, 2000, well within three years or two years of the end of defendants' campaign to teach the plaintiffs' a lesson.

The defendants began the campaign to teach Mr. Egbarin a lesson by harassing and abusing the plaintiffs in March 1995. The campaign, at least for the purpose of this claims, continued until Mr. Egbarin lost his license on June 22, 1999.

Therefore, plaintiffs' intentional and negligent emotional distress claims are timely.

### 6. Plaintiffs state a claim of tortious Interference with Business Expectancy.

The elements of a claim for tortuous interference with contractual rights or financial expectancies are (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship and; (3) as a result of the interference, the plaintiff suffers actual loss. Hi-Ho Tower, Inc v. Com-Tronics, Inc, 255 Conn. 20, 27 (2000) (Internal citations omitted).

The collection fraud scheme, (**Ex. 1**, Egbarin Aff. ¶¶31-35, 38, 45); (Pls' 56(a) 2 Statement, ¶¶32);(Pls' **Exs, 20-24,29 & 34)**, and the Retaliatory grievance scheme, (**Ex. 1**, Egbarin Aff. ¶49-50); (Pls' 56(a) 2 Statement, ¶¶32, 33 & 35);(Pls' **Exs, 31, 33, 35 & 36)**, which are fully described in the mail fraud section under RICO above, apply here and are incorporated here by reference.

Similarly, the defendants' activities described above, under the infliction of emotional distress apply and are incorporated by reference. Plaintiffs' expert opinion is that Mr. Egbarin suffered lost income, $1,290,632 to $2,328,445, as a result of the courts' intervention in plaintiffs' business. See, Ex. 43.

51

Defendants' activities as described interfered with Mr. Egbarin's law practice. Defendants targeted the plaintiffs' business to teach Mr. Egbarin a lesson and filed false grievance in carrying out this campaign. Defendants expressed their intentions in open court, (Ex. 24, P. 4) and subsequently carried out their intentions.

The defendants' intentions were tortious and the defendants' interference in plaintiffs' business resulted in the courts' intervention in plaintiffs' business and destroying the business. Plaintiffs' economic expert opined that the lost income from plaintiff's business was caused by the courts' intervention in the plaintiffs' law practice. See **Ex. 43**, P. 1 and second page.

Accordingly, the plaintiffs' evidence supports a reasonably conclusion that the Defendants' activities as described, interfered with the plaintiffs' business.

## 7. <u>Plaintiffs' claim of tortious Interference with Business Expectancy is Timely</u>

The claims were initiated on May 23, 2000, well within the three years[5] of the end of defendants' campaign to teach the plaintiffs' a lesson.

The defendants began the campaign to teach plaintiffs a lesson by interfering and targeting plaintiffs business in March 1995. The campaign continued until Mr. Egbarin lost the license for the business on June 22, 1999.

## 8. <u>The Conducts of the defendants Lewis and Lewis Lewis, violate CUTPA</u>

The Connecticut Supreme Court stated:

[W]e have declined to hold that every provision of CUTPA permits regulation of every aspect of the practice of law. . . . We have stated, instead, that, only the entrepreneurial aspects of the practice of law are covered by CUTPA. . . . [W]e conclude that professional negligence--that is, malpractice--does not fall under CUTPA. (citations omitted; internal quotation marks omitted.) Suffield Dev. Assocs. Ltd. Partnership v. Nat'l Loan Investors, 260 Conn. 766, 781 (2002). "[T]he most significant question in considering a CUTPA claim against an attorney is whether the allegedly improper conduct is part of the attorney's professional representation of a client or is part of the entrepreneurial aspect of practicing law." Suffield Dev. Assocs. Ltd. Partnership v. Nat'l Loan Investors, 260 Conn. 766, 781 (2002). "The 'entrepreneurial' exception is . . . a specific exception from CUTPA immunity for a well-defined set of activities, [including] advertising and bill collection." Id. at 782.

---

[5] Connecticut General Statute, §52-577 provides for a three-year limitations period to commence an action for tortuous interference with business expectancy.

Lewis and Lewis' bill collection activities fall under the exception from CUTPA immunity.

The defendants' collection fraud scheme, (**Ex. 1,** Egbarin Aff. ¶¶31-35, 38, 45); (Pls' 56(a) 2 Statement, ¶¶32);(Pls' **Exs, 20-24,29 & 34),** and the Retaliatory grievance scheme, (**Ex. 1,** Egbarin Aff. ¶49-50); (Pls' 56(a) 2 Statement, ¶¶32, 33 & 35);(Pls' **Exs, 31, 33, 35 & 36),** which are fully described in the mail fraud section under RICO above, apply here and are incorporated here by reference.

Lewis also lied under oath in this matter. **See,** (Plaintiffs' 56(a) 2 Statement, **¶¶18, 20, 22, 23, 26, 27, 28, 29, and 30).**

In addition, the evidence shows that the Lewis made misrepresentations, submitted false evidence and gave false testimonies in the course of the court proceedings in Hartford Superior Court, New Britain Superior Court and the grievance Presentment in the Hartford Superior Court. Pls' 56(a) 2 Statement, ¶¶ 22, 23, 24, 35 and even 40).

These misconducts of Lewis, infra, violate professional Rules of Conduct, Rule 3.3, 4.1 and 8.4, **Ex. 40; Ex. 41, and Ex. 42)** which are the public policy of this state.

Furthermore, the independent expert opinion is that the Lewis defendants concealed material information from a bank in

54

violation of 18 U.S.C. §1001. Ex. 2, Borrelli Rep. P. 4); (Pls' 56(a) 2 Statement, ¶20).

The Lewis defendants' bill collection activities fall under the exception from CUTPA immunity.

### 9. Plaintiffs' CUTPA claim is Timely

The claims were initiated on May 23, 2000, well within the three years[6] of the end of defendants' campaign to teach the plaintiffs' a lesson and bill collection activity.

The Lewis defendants' bill collection activities began in March 1995 and continued beyond June 22, 1999, until November 2000 during the Egbarins' bankruptcy, Lewis engaged in the last collection activity.

---

[6] Connecticut General Statute, §42-110g (f) provides for a three-year limitations period to commence for CUTPA actions.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, the defendants' motions for Summary Judgment dated May 27, 3005 should be denied.

THE PLAINTIFFS

BY _____
Nitor V. Egbarin, pro se
28 Ely Place
Simsbury, CT  06070
Tel.: (860) 680-1448


BY _____
Janet J. Egbarin, pro se
28 Ely Place
Simsbury, CT  06070
Tel.: (860) 680-1448

CERTIFICATION

This is to certify that a copy of the foregoing was on the above date mailed postage prepaid to all counsel of record as follows:

Thomas J. Hagarty, Jr.
Halloran & Sage LLP
One Goodwin Square
Hartford, CT 06103

Laura Pascale Zaino
Halloran & Sage LLP
One Goodwin Square
Hartford, CT 06103

Joseph V. Meaney, Jr.
Cranmore, FitzGerald & Meaney
49 Wethersfield Avenue
Hartford, CT 06114

By_____
Nitor V. Egbarin