UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NITOR V. EGBARIN, | : | |
| and JANET J. EGBARIN | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:00-CV-1043 (JCH) |
| | : | |
| LEWIS, LEWIS & FERRARO LLC, | : | |
| SCOTT F. LEWIS, CLAUDE J. PICARD,: | | |
| and PAULINE M. PICARD, | : | |
| Defendants. | : | JANUARY 3, 2006 |

**RULING  RE: DEFENDANTS' MOTIONS
FOR SUMMARY JUDGMENT [DKT. NOS. 54 & 57]**

The plaintiffs, Nitor V. Egbarin and Janet J. Egbarin, who proceed pro se,

initiated this action against the defendants, Lewis, Lewis & Ferraro LLC and Scott F.

Lewis (hereinafter the "Lewis defendants"),  Claude J. Picard, and Pauline M. Picard,

for damages allegedly arising from circumstances surrounding a real estate transaction

between the Egbarins and the Picards.  In their First Amended Complaint, the Egbarins

assert federal causes of action against all defendants under the Racketeering Influence

and Corrupt Organization Act, 18 U.S.C. § 1962(c),  against the Lewis defendants

under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692d(2) and 1692e, and

several state causes of action against all defendants.  The defendants have moved for

summary judgment on all of the plaintiffs' causes of action.[1]  For the following reasons,

the defendants' motions for summary judgment are GRANTED.

---

[1]The Lewis defendants have jointly moved for summary judgment [Dkt. No. 54], and
the Picards have filed a joint motion for summary judgment [Dkt. No. 57] that is nearly
identical to that filed by the Lewis defendants.  For example, the Rule 56(a)(1) Statements
filed by the Lewis defendants and the Picards are verbatim copies of each other.  For
purposes of this Ruling, the defendants' motions for summary judgment will be discussed
together, but all references and citations will be made only to the Rule 56(a)(1) Statement
filed by the Lewis defendants for ease.

## I.  FACTUAL BACKGROUND[2]

This lawsuit involves the circumstances pertaining to the financing of a real

estate transaction between the Egbarins and the Picards.  The property in question was

residential property in Bloomfield, Connecticut.  In the transaction, the Picards were the

sellers of the property, the Egbarins were the purchasers, and Scott F. Lewis, who is a

member of Lewis, Lewis & Ferraro, L.L.C., represented the Picards in the transaction

and subsequent litigation.  Prior to the conclusion of the events described below, Nitor

Egbarin was a practicing attorney in Connecticut.

### A.      The Purchase Agreement

In September 1992, the Egbarins entered into an agreement with the Picards for

the purchase of the property known as 8 North Cliff Drive, Bloomfield, Connecticut.  The

agreement set a purchase price of $330,000 and a closing date of October 1, 1993,

with a right to an extension under April 1, 1994.  Prior to the closing, the Egbarins were

to occupy the property and pay a monthly payment of $2,100 to the Picards, $500 of

which would be credited towards the down payment on the purchase price.  The

Egbarins were also to pay $10,000 toward the down payment upon the making of the

agreement, and an additional $10,000 at the time of the extension of the closing date.

By April 1994, the Egbarins had paid a total of $29,500 to the Picards, which the

Picards held in escrow.  Pls' Rule 56(a)(2) Statement, Ex. 11 [Dkt. 63-8].

The Egbarins had trouble securing a mortgage at a favorable rate.  According to

---

[2]For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the non-moving parties, here the plaintiffs, where there is evidence to support their allegations.

the Egbarins, Claude Picard talked to James Rifkin, the owner of Sanborn Corporation ("Sanborn"), on behalf of the Egbarins and referred the Egbarins to Sanborn for a mortgage.  Id., Ex. 1, Egbarin Aff., ¶ 7.  The Egbarins applied for a mortgage with Sanborn which was approved by Rifkin in March 1994.  In April 1994, Sanborn appraised the property at $300,000– $30,000 less than the agreed upon purchase price– and issued a commitment letter in May 1994 to the Egbarins to make a $270,000 loan based upon a $300,000 purchase price.  Id., Ex. 12, Commitment Letter.

Nitor Egbarin and Claude Picard met in May 1994 to discuss the purchase price difference.  Picard was unwilling to accept less than $330,000 for the property.  According to Egbarin, Picard explained to Egbarin at this meeting that he had spoken with the bank appraiser prior to the appraisal, and that the bank's appraisal was intentionally inaccurate as the bank would not approve loans higher than $300,000.  Id., Ex. 1, Egbarin Aff. ¶ 17.  Picard offered to enter into a separate mortgage agreement with the Egbarins for an additional $30,000 so as to preserve the original purchase price of the property.  Id.

To facilitate this transaction, the Egbarins agreed to a written amendment to the original purchase agreement that was drafted by the Lewis defendants and approved after revisions by the Egbarins.  The amendment agreement provided that the buyers had requested that the purchase price for the property in question be reduced from $330,000 to $300,000.  Id., Ex. 13, "Amendment to Purchase and Sale Agreement."  In exchange for agreeing to reduce the purchase price by $30,000, the sellers were to receive, as consideration, the $29,500 that they held in escrow under the previous agreement.  Id.  In particular, the agreement provided that:

3

> [I]t is hereby agreed between the parties that the purchase price of the premises known as 8 Northclif Drive, Bloomfield, Connecticut is hereby reduced from $330,000.00 to $300,000.00. In consideration thereof, all monies paid by Buyers to the Seller heretofore under the Purchase, Sale & Lease Agreement of September 16, 1992 are hereby considered earned and non-refundable. Furthermore, Sellers shall not apply as a credit said funds already paid to them by Buyers to the amended purchase price of $300,000.00.

Id. In other words, in exchange for approximately $30,000, the Picards agreed to lower the purchase price of the property by $30,000. This agreement was signed by both the Picards and Egbarins. In his affidavit, Nitor Egbarin states that he believes that the Lewis defendants sent the "fully signed original Amendment to Purchase and Sale Agreement in the U.S. mail to Sanborn." Id., Ex. 1, Egbarin Aff., ¶ 22.

### B.    The Closing

On May 31, 1994, the parties met for the closing. At the closing, in a separate room from where the closing on the Sanborn loan took place, Attorney Lewis presented the Egbarins with a promissory note and statutory mortgage deed for $30,000, both of which both Egbarins signed. Id., Ex. 1, Egbarin Aff., ¶ 24; Exs. 14-15. A copy of the promissory note and statutory deed were later recorded in the Lands Record office of Bloomfield, Connecticut and sent to the Egbarins via United States mail.

In addition, on May 31, 1994, the parties finalized, with Sanborn, the mortgage loan of $270,000 with a deposit of $30,000.[3] It is unclear whether it was disclosed to

---

[3]In their Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment, the plaintiffs assert they used "the $30,000 cash in escrow" as the down payment for the Sanborn loan and "did not need an additional sum of $30,000 to close the transaction." Pls' Memo. of Law, p. 5. In support of these propositions, the plaintiffs cite to the deposition of the attorney that represented Sanborn at the closing, a letter addressed to the Egbarins from the Picards, which Egbarin attests was sent to Sanborn in May 1994, stating the amount held in escrow in April 1994, and Nitor Egbarin's

Sanborn that the source of the deposit would be the mortgage loan between the Egbarins and Picards. Both Picards admit that they did not personally informed Sanborn that the promissory note was intended as the down payment for the closing of the property. Id., Exs. 37 and 39. At deposition, Sanborn's attorney testified that there was no copy of the $30,000 promissory note in the attorney's files associated with the closing. Id., Ex. 6, Gilligan Depo., p. 29. Sanborn's attorney also testified that, had he received the promissory note at the closing, he would have contacted Sanborn, consistent with his routine practice, to obtain approval for subordinate financing. Id. at 36. In addition, the Sanborn commitment letter stated that subordinate financing was not permitted without written approval from Sanborn. Id., Ex. 12. In his own affidavit, however, Lewis asserts (and the Egbarins contest) that a copy of the $30,000 promissory note was found in Sanborn's files when they were produced under subpoena. Def's Rule 56(a)(1) Statement, Ex. A, Lewis Aff., ¶ 35 [Dkt No. 54]. Nitor Egbarin also testified at his deposition that he informed Rifkin, the owner of Sanborn, of the Picard's offer for a second mortgage of $30,000. Pl's Rule 56(a)(2) Statement, ¶ 29.

At the closing, Janet Picard and the Egbarins also signed a "HUD-1 Settlement

---

deposition testimony. Id. These documents do not provide evidentiary support to the positive assertion that, at the time of the closing, the bank specifically considered the amount held in escrow to be the source of the $30,000 deposit in making its loan. The court does not know what to make of the assertion, in light of the signed amendment agreement, and the signed $30,000 promissory note, that the "Egbarins did not need an additional sum of $30,000 to close the transaction." Id. If, as Nitor Egbarin has attested in his affidavit, the Egbarins agreed to circumvent Sanborn's requirement that the purchase price be $300,000 and pay the Picards a total of $330,000, then an additional $30,000 was clearly required to close the "transaction," considered as a whole.

Statement" ("HUD-1") as required by the Real Estate Settlement Procedures Act, 18 U.S.C. § 2603.  The HUD-1 states that the contract sales price for the property was $300,000.00.  Pl's Rule 56(a)(2) Statement, Ex. 16, HUD-1 Settlement Statement. Under "Amounts Paid by or in Behalf of Borrower," the HUD-1 lists a "Deposit or earnest money" of $30,000.00 and a "Principal amount of new loan(s)" of $270,000.00. Id.  Under "Reductions in Amount Due to Seller" the HUD-1 lists as "Deposit or earnest money" of $30,000.  Id.  In other words, the HUD-1 is written as if the Picards were in possession of a $30,000 cash deposit from the Egbarins, and it does not disclose the existence of the secondary loan of $30,000.

The parties contest the reason for the omission of the $30,000 loan from the HUD-1.  According to the Egbarins, the $30,000 referred to in the HUD-1 is meant to refer to the cash held in escrow by the Picards and not a note or mortgage.  Pl's 50(a)(2) Statement, ¶ 26.  The Egbarins also maintain that the HUD-1 should have reflected a purchase price of $330,000 because that is what the Picards actually received in consideration for the property.  According to the defendants, the omission of the $30,000 secondary loan was merely a clerical error on the part of the bank's attorney who prepared the form, the $30,000 listed in the HUD-1 Statement as deposit or earnest money actually referred to the secondary loan, and the bank was aware that the loan was 100% financed.  Defs' Rule 56(a)(1) Statement, ¶ 28, 31; Lewis Def's Memo. of Law, p. 4 [Dkt. No. 54-3].

### C.    Subsequent Events and Litigation

After the closing, in January 1995,  the Egbarins did not make payments to the Picards on the $30,000 mortgage.  In his affidavit, Nitor Egbarin explains that he was

6

informed by "a few friends familiar with the real estate market" that his property was properly assessed at $300,000, not the $330,000 he agreed to pay for it, and thus "felt cheated."  Pl's Rule 56(a)(2) Statement, Ex. 1, Egbarin Aff., ¶¶ 27-28.   Egbarin also attests that he asked Claude Picard for an extension of time to begin making payments on his second mortgage, which Picard refused.  Id.

In March 1995, the Picards, represented by the Lewis defendants, commenced a foreclosure action against the Egbarins in Hartford Superior Court.  Lewis also represented the Picards against the Egbarins in another action, initiated in New Britian Superior Court in December 1995, in which the Picards sought a prejudgment remedy attachment against the Egbarins.  The Egbarins assert that, in the course of prosecuting these actions, the defendants filed affidavits from the Picards containing false statements and that Lewis lied to the judge concerning the information on the HUD-1.

In support of the contention that Lewis lied in the course of the foreclosure action, the Egbarins point to Lewis's statement to the Hartford court that the HUD-1 "indicates there was deposit or earnest money of $30,000.00 . . . .  And that deposit in earnest money was by promissory note, and my client's affidavit says that,"  Pl's Rule 56(a)(2) Statement, Ex. 24, Court Transcript, p.3, and Lewis's statement to the court that the secondary loan "was fully disclosed.  All the documents were sent to the bank." Id., Ex. 29, Court Transcript, p. 23. Pl. Memo. of Law, p. 7.  With regard to the affidavits, the Egbarins challenge the statements made by the Picards in that the purchase price of their home was $300,000 and that $30,000 of that amount was to be covered by the $30,000 loan from the Picards.  Pl's Memo. of Law, p. 27-28.  The

7

Egbarins argue that the Picards' statements misrepresent the transaction as the Picards received $330,000 as consideration for the property, and that the Picards failed to disclose to the court that they violated the law by not disclosing the existence of the $30,000 mortgage to Sanborn.

In defending these lawsuits, the Egbarins pled fraud as a defense and pled a counterclaim on the basis of fraud and misrepresentation, and also accused the Picards and Lewis of making false statements and using false affidavits. Following a hearing on the prejudgment remedy in the New Britain court, the plaintiffs received court orders attaching the Egbarins' property and freezing the assets and accounts of the Egbarins, and received a copy of an order sent to out-of-state banks. Following a motion for contempt, Nitor Egbarin also received an order freezing the revenues from his personal injury law practice. Pl's Rule 56(a)(2) Statement, Exs. 25, 26, 27, 30. Summary judgment was ultimately granted in favor of the Picards in July 1998.

On February 13, 1997, Lewis, after consulting with the Picards, filed a grievance charge with the Statewide Grievance Committee against Nitor Egbarin. Egbarin attests in his affidavit that, prior to filing the grievance charge, Lewis told Egbarin that he would report Egbarin to the bar if Egbarin failed to pay the $30,000 plus his attorney's fees.[4] Pl's Rule 56(a)(2) Statement, Ex. 1, Egbarin Aff., ¶ 49. The grievance charge accused Egbarin of failing to disclose to the Picards that Egbarin did not file the 1992 and 1993 tax returns that Egbarin disclosed to the Picards in relation to the $30,000 loan. Both

---

[4]Egbarin's affidavit also states that Claude Picard threatened to assault him at a deposition, that Lewis accused Egbarin in court of engaging in money laundering, and that Lewis told Egbarin that he was "going to teach me a lesson." Pl's Rule 56(a)(2) Statement, Ex. 1, Egbarin Aff., ¶ 49.

Lewis and Claude Picard testified at the September 10, 1997 hearing before the Statewide Grievance Committee.  Egbarin attests that he never gave the Picards a copy of his 1992 or 1993 tax returns at any time in 1994 and asserts that Lewis and Picard lied to the Grievance Committee regarding these tax returns.  Pl's Rule 56(a)(2) Statement, Ex. 1, Egbarin Aff., ¶ 50.  On June 22, 1999, Egbarin received a decision from the Hartford Superior Court finding that the Statewide Grievance Committee had met its burden of demonstrating that Egbarin violated Rule 8.4(3) of the Rules of Professional Conduct for failing to disclose that, while Egbarin's 1992 and 1993 returns were filed, his taxes were not paid for those years.  The court ordered that Egbarin was to be suspended from the practice of law for five years.[5]  The court's decision was later upheld on appeal.

The Egbarins filed the present action on June 7, 2000.  The action was stayed, and eventually dismissed, without prejudice to reopen, in March 2001 because of the Egbarins' bankruptcy.  In July 2004, the Egbarins moved to reopen the case pursuant to the court's March 19, 2001 order of dismissal, and moved to file an amended complaint. The complaint asserts causes of action against all defendants under the Racketeering Influence and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c), against the Lewis defendants under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692d(2) and 1692e, as well as against all defendants for fraud, intentional infliction of emotional distress, negligent infliction of emotional distress, tortious interference with

---

[5]In recounting the facts of the case before it, the Hartford court noted that "a simple home purchase evolved into an unmitigated disaster."  Pl's Rule 56(a)(2) Statement, Ex. 5, Memorandum of Decision, p. 15.

business expectancy, and violation of the Connecticut Unfair Trade Practices Act ("CUTPA").[6]  The defendants have moved for summary judgment, arguing, <u>inter alia</u>, that the plaintiffs' claims are untimely, are barred by res judicata and collateral estoppel, and that the plaintiffs have failed to demonstrate the existence of a material issue of fact with regard to their claims that would entitle them to a jury trial under the applicable legal standards.

## II.     LEGAL STANDARD

Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Hermes Int'l v. Lederer de Paris Fifth Ave, Inc.</u>, 219 F.3d 104, 107 (2d Cir. 2000). The moving party bears the burden of showing that no genuine factual dispute exists. <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129, 133 (2d Cir. 2000) (citing <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1223 (2d Cir. 1994)). "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law."  <u>Jeffreys v. City of New York</u>, 426 F.3d 549, 553 (2d Cir. 2005)(quotation marks omitted).  When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.  <u>Sologub v. City of New York</u>, 202 F.3d 175, 178 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for

---

[6]In their Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment, the plaintiffs abandon their fraud claim. Pls' Memo. of Law, p. 46.

trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a Summary Judgment Motion." Lipton v. The Nature Company, 71 F.3d 464, 469 (2d Cir. 1995) (quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986)). Additionally, a party may not rest on the "mere allegations or denials" contained in his pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the summary judgment motion are not credible). Moreover, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Jeffreys, 426 F.3d at 554.

Where the plaintiff is proceeding pro se, the court will liberally construe his pleadings and "interpret them 'to raise the strongest arguments that they suggest.'" McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999) (citing Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994)). However, "application of this different standard does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003). Moreover, the deference afforded pro se litigants is not typically granted to law school graduates representing themselves pro se. See Padilla v. Payco General American Credits, Inc., 161 F.Supp.2d 264, 271 (S.D.N.Y.,2001)(citing cases).

11

### III. DISCUSSION

As the facts clearly indicate, there is a genuine factual dispute at least as to whether the existence of the $30,000 loan was properly disclosed to Sanborn. However, this fact is not material to the specific claims asserted by the Egbarins. For the reasons discussed below, the court finds that summary judgment is appropriate given the lack of a genuine factual issue with regard to the facts that are material to the Egbarins' claims.

#### A. RICO Enterprise

The Egbarins assert a claim against all of the defendants under the RICO statute,  18 U.S.C. § 1962(c).  The RICO statute makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).  To prove a claim under section 1962(c), a plaintiff must produce evidence demonstrating that (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.  AIU Ins. Co. v. Olmecs Medical Supply, Inc., No. CV-04-2934(ERK), 2004 WL 3270060, at *6 (E.D.N.Y. Feb. 22, 2004) (citing Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983).

Among other aspects of the plaintiffs' RICO claim, the defendants challenge the

sufficiency of the plaintiffs' evidence that the defendants were engaged in an "enterprise" under the RICO statute.  The statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C.A. § 1961 (4).  As the Second Circuit has recently noted, see First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004), the Supreme Court has described a RICO enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981).  The Second Circuit also stated in First Capital that an "enterprise may be found where there is simply a discrete economic association existing separately from the racketeering activity." 385 F.3d at 173.

For an association of individuals to constitute an enterprise, "the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." Id. at 174 (quoting First Nationwide Bank v. Gelt Funding Corp., 820 F.Supp. 89, 98 (S.D.N.Y. 1993).  Second Circuit courts have construed "enterprise" liberally.  See AIU Insurance, 2004 WL 3270060, at *6 (citing United States v. Indelicato, 865 F.2d 1370, 1382 (2d Cir. 1989).  Courts in the Second Circuit also look to the "hierarchy, organization, and activities of an association-in-fact to determine whether its members functioned as a unit." Id. (quoting United States v. Coonan, 938 F.2d 1553, 1560-61 (2d Cir. 1991)(quotation marks omitted)).

Furthermore, while the same evidence may be used to demonstrate both

13

elements, see United States v. Mazzei, 700 F.2d 85, 88 (2d Cir. 1983), "the enterprise must be separate from the pattern of racketeering activity and distinct from the person conducting the affairs of the enterprise."  First Capital, 385 F.3d at 173 (citing Turkette, 452 U.S. at 583).  An enterprise is "an entity separate and apart from the pattern of activity in which it engages" and "at all times remains a separate element that must be proved . . . ." Turkette, 452 U.S. at 583.

The Egbarins assert that the enterprise in the instant case is "an association of individuals, who are Mr. Picard, Mrs. Picard and Lewis" and who "shared the common purpose of defrauding a lending bank and the plaintiffs when they lied and hid facts in order to obtain $30,000 more than the bank-appraised value of the Picards' property and in order to collect these monies against plaintiffs."  Pls' Memo. of Law, p. 16.  As evidence of the existence of this association-in-fact, the Egbarins point to the following facts: (1) Claude Picard misrepresented facts in his May 1994 meeting with Nitor Egbarin concerning the bank's appraised value, (2) the Lewis defendants drafted the purchase agreement amendment in consultation with Claude Picard, (3) the Lewis defendants drafted the second mortgage documents which were concealed from the bank by "all of the defendants," (4) Pauline Picard signed the HUD-1 Statement, (5) the Lewis defendants recorded the second mortgage document in the Bloomfield Lands Records office, (6) the Lewis defendants prepared and submitted false affidavits that were (7) signed by the Picards, (8) Scott Lewis made false statements in court and filed false grievance charges, and (9) Lewis and Mr. Picard gave false testimony in court.[7]

---

[7]The Egbarins also list as a "fact" supporting the existence of an enterprise the contention that "all defendants commenced collection actions and filed grievance charges

Pls' Memo. of Law, p. 17.

These activities, which also form the basis of the plaintiff's allegations concerning the defendants' pattern of racketeering, fail to demonstrate the existence of an "ongoing organization" that functions "as a continuing unit." Turkette, 452 U.S. at 583. Even assuming, for purposes of this summary judgment motion, that there were fraudulent actions on the part of the defendants in the real estate transaction in question, the specific facts identified by the Egbarins, to the extent that they are supported by evidence, do not support the inference that the defendants were engaged in the type of cooperative venture required to constitute a RICO enterprise. In First Capital, for example, the plaintiffs alleged that an enterprise existed that had the purpose of concealing a defendant's assets from his creditors and the bankruptcy court. The plaintiffs alleged predicate acts by the defendants that largely consisted of making false statements in connection with a bankruptcy proceeding and performing fraudulent transactions between each other that served to frustrate creditors' attempts to reach the defendant's assets. 385 F.3d at 169-70. The Second Circuit found that the plaintiffs had not sufficiently alleged the existence of a RICO enterprise, noting that the complaint failed "to detail any course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves– a requirement in this

---

to compel the plaintiffs to pay the Picards the $30,000 second mortgage." Pls' Memo. of Law, p. 17. Even crediting the Egbarin's version of the evidence for purposes of this summary judgment motion and drawing all inferences in their favor, the court does not consider it a "fact" that "all defendants" brought these actions together. The collection actions were brought by the Picards through the representation of the Lewis defendants, and the grievance charge was brought by Scott Lewis with the subsequent cooperation, as a witness, of Claude Picard.

Circuit." Id. at 174. It noted that the plaintiffs "failed to provide us with any solid information regarding the hierarchy, organization, and activities . . . of this alleged association-in-fact enterprise from which we could conclude that its members functioned together as a unit." Id. (internal quotation marks and citations omitted). See also Feinberg v. Katz, No. 99-CIV-45(CSH), 2002 WL 1751135 (July 26, 2002)(finding defendants did not work together as a continuing unit where all but one of the allegations of fraud involved actions by a single defendant, and there was no evidence that the other defendant had control over the alleged enterprise).

Similarly, the factual evidence put forward by the Egbarins could not support a reasonable jury's conclusion that the defendants functioned as a entity in which the defendants worked together in furtherance of their alleged purpose. The evidence largely consists of actions taken by the Lewis defendants in representing the Picards. These actions do not support the inference of the existence of an ongoing organization that is separate from the alleged pattern of activity itself, nor suggest that the defendants worked together to function as a "integrated unit." Singh v. Parnes, 199 F.Supp.2d 152, 162 (S.D.N.Y. 2002). Instead, the "hierarchy, organization, and activities," First Capital, 385 F.3d at 173, of the alleged enterprise constituted a professional service relationship of the type that does not typically give rise to RICO liability. Cf. West 79th Street Corp. v. Congregation Kahl Minchas Chinuch, No. 03-civ-8606RWS, 2004 WL 2187069, at *14 (S.D.N.Y. Sept 29, 2004)(citing cases for the proposition that "[m]erely rendering services to an alleged enterprise does not establish

that a person or entity controls the enterprise for purposes of Section 1962(c)").

Therefore, the court concludes, the Egbarins have not demonstrated a triable issue of

fact that would support a reasonable fact finder's conclusion that a RICO enterprise, as

identified by the Egbarins, existed.[8]  Accordingly, summary judgment in favor of the

defendants on the Egbarins' RICO claim is GRANTED.

### B.    FDCPA Statute of Limitations

The Egbarins also assert claims against the Lewis defendants under the Fair

Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692d(2) and 1692e.  The

FDCPA is aimed at eliminating the use of "abusive, deceptive, and unfair debt collection

practices by . . . debt collectors."  15 U.S.C. § 1692(a).  Section 1692(d) prohibits debt

collectors from engaging in "conduct the consequence of which is to harass, oppress, or

abuse any person in connection with the collection of the debt," and section 1692(d)(2)

specifically prohibits the use of "obscene or profane language or language the natural

consequence of which is to abuse the hearer or reader."  Section 1692e prohibits debt

_____

[8]In their Surreply [Dkt. No. 70], the Egbarins also suggest that the defendants' association for the purpose of leasing and selling the Bloomfeld property constituted an enterprise as it was "discrete economic association which exists separately from the association's racketeering activities." Pl's Surreply, p. 1; First Capital, 385 F.3d at 173 ("In perhaps its least developed form, an enterprise may be found where there is simply a discrete economic association existing separately from the racketeering activity.").  The court reads the "discrete economic association" definition of a RICO enterprise mentioned in First Capital in light of the other characterizations of a RICO enterprise in that case, namely that an enterprise is a "ongoing organization" functioning as a "continuing unit." Id. at 173.  Accordingly, although the  defendants associated for the purpose of selling the Bloomfeld property, they clearly did not form an ongoing association, in terms of an informal organization, as was clearly meant by the court in First Capital. See Id. at 174.

collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt" and specifically prohibits the "false representation of the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A).

In their complaint, the Egbarins assert that the actions of the Lewis defendants "constitute repeated misrepresentations of material facts, or non-disclosure of necessary information, and were in fact, continuing and fraudulently concealed, all of which were intentionally engaged in or used to collect or attempt to collect the debt . . . in violation of 15 U.S.C. § 1692e."  First Amended Complaint, ¶ 151 [Dkt. No. 38].  They also assert that the actions of the Lewis defendants "constitute harassment, oppression, and abuse of the plaintiffs, and are continuing and fraudulently concealed . . . in violation of 15 U.S.C. § 1692d(2)."

The Lewis defendants argue that the Egbarins' FDCPA claims should be barred by the doctrines of res judicata and privilege, that the claims are barred by the FDCPA's statute-of-limitations, and that the plaintiffs cannot show that the defendants are debt collectors within the meaning of the Act.  Because the court finds that the Egbarins' claims are barred by the FDCPA's statute-of limitations, it does not reach the other issues raised by the defendants.

Section 1692k(d) of Title 15 of the United States Code provides that an action under the FDCPA may be brought "within one year from the date on which the violation occurs."  The Egbarins' original complaint was filed on June 7, 2000.  Thus alleged

violations of the FDCPA that occurred before June 7, 1999 are time-barred.  See

Petrolito v. Arrow Financial Services, LLC., 221 F.R.D. 303, 315 (D.Conn. 2004)(Hall,

J.)(certifying "one-year FDCPA class" dating backwards from the filing of the complaint).

Any events upon which the Egbarins could possibly assert FDCPA claims all

occurred before June 7, 1999 and thus their claims are time-barred.  The efforts of the

defendants to collect on the $30,000 loan for which the Egbarins have produced

evidence substantially occurred in 1995 through 1998.  The two court proceedings

directly concerning the $30,000 loan, in which the defendants' misrepresentations

about the transaction were alleged to have occurred, were initiated in 1996 and

resolved by July 1998.  The allegedly threatening and abusive comments that were

made by the Lewis defendants occurred in the course of these proceedings. Pl's Rule

56(a)(2) Statement, Ex. 1, Egbarin Aff., ¶ 49.

The alleged threat by Lewis to file grievance charges against Nitor Egbarin is

alleged to have occurred before February 1997, and the grievance charges were filed

by Lewis in February 1997.  Id.  The Egbarins argue that, because the court's order in

the grievance matter was handed down on June 22, 1999, their FDCPA claim based on

the grievance complaint is not time-barred.  The court does not agree.  FDCPA claims

based on the filling of a lawsuit generally accrue when a claim is filed, not when

judgment is rendered.  See Calka v. Kucker, Kruas & Bruh, LLP, No. 98-CIV-

0990(RWS), 1998 WL 427151, at *3 (S.D.N.Y. Aug. 3, 1998)(finding that FDCPA claim

accrued on date that lawsuit was filed, rejecting theory that each action in the

prosecution of a lawsuit amounts to a continuing violation of the FDCPA); see also

Sierra v. Foster & Garbus, 48 F.Supp.2d 393, 395 (S.D.N.Y. May 11, 1999)(citing

Calka).  The case cited by the Egbarins, Kouabo v. Chevy Chase Bank, F.S.B., 336

F.Supp.2d 471 (D.Md. 2004), does not stand for an contradictory holding.  In Kouabo,

the court simply noted that the entry of judgment in a collection lawsuit, which was the

latest date that might possibly be considered a violation of the FDCPA, was also well

out of the relevant time period.  Id. at 475.

Moreover, it is important to note that the grievance action in this case was not

itself a collection action.  While Lewis's allegedly extortionist threat to initiate the

grievance action could potentially give rise to an FDCPA claim, once it was filed, the

grievance could no longer be characterized as a violation of the FDCPA as the

collection of a debt was not the subject of the grievance proceedings.  The Connecticut

court's determination that Nitor Egbarin violated the Rules of Professional Conduct

does not itself constitute a violation of the FDCPA by the Lewis defendants.  Thus, the

Egbarins' FDCPA claim based on the Lewis defendants' actions in pursuing the

grievance action against Nitor Egbarin properly accrued either when the action was

threatened or was filed in 1997, and is thus barred by the one-year bar in 15 U.S.C. §

1692k(d).

The Egbarins make two other arguments in support of their position that their

FDCPA claims are not time-barred.  They argue, without citing any authority in support

of the viability of their theory, that the defendants' actions constitute a "continuing

violation" of the FDCPA that tolls the statute of limitations for acts prior to the one-year bar, and note, in support of this position, that their bankruptcy attorney was contacted in November 2000 regarding their debt to the Picards.  Although a few district courts within the Second Circuit have discussed the possibility of a continuing violation theory under the FDCPA, none have found the doctrine applicable.  See Macarz v. Transworld Systems, Inc., 193 F.R.D. 46, 57 (D.Conn. 2000); Sierra, 48 F.Supp.2d at 395 (noting possibility of continuing violation theory where "defendants have sent a series of threatening letters, each of which violate the FDCPA and only some of which are time-barred."); Calka, 1998 WL 437151 at *3 (rejecting continuing violation theory based on actions undertaken in prosecution of lawsuit).

The district court in Joseph v. J.J. Mac Intyre Cos., L.L.C., 281 F.Supp.2d 1156 (N.D.Ca. 2003), discussed the possibility of a continuing violation theory under the FDCPA at length.  Id. at 1159-62.  The court in Joseph noted that whether the continuing violation doctrine applied to the FDCPA was an open question and analogized the situation presented in FDCPA cases to hostile work environment cases in which continuing violations are sometimes held to toll statutes of limitations.  Id. at 1160.   The court concluded that the application of the doctrine is possible in FDCPA cases where, as in hostile work environment cases, the conduct complained of "constitutes a continuing pattern and course of conduct as opposed to unrelated discrete acts."  Id. at 1161.  The court went on to find that a continuing violation existed where the defendant made over 200 calls to the plaintiff's residence over a nineteen-

month period.  Id. at 1162.

Even if the standard of Joseph were imported into this circuit, the facts of the instant case do not support the application of the continuing violation doctrine to toll the FDCPA one-year bar.  Unlike the pervasive pattern of phone calls over a long period of time in Joseph, or the hypothetical series of letters mentioned in Sierra, the alleged actions of the Lewis defendants that are supported by evidence produced by the Egbarins were dissimilar, discrete acts that did not, by "[t]heir very nature involve[] repeated conduct."  Id.  Thus, the court finds the Egbarins' continuing violation argument to be without merit.

Finally, the Egbarins elsewhere suggest that the communication in November 2000 between the Lewis defendants and the Egbarins' bankruptcy attorney is itself actionable under the FDCPA.  The only evidence submitted concerning this communication is the statement in Nitor Egbarin's affidavit that, in November 2000, "[i]n spite of the awful situation, Lewis sent communication to me through my bankruptcy attorney about his clients' $30,000 debt."  Pls' Rule 56(a)(2) Statement, Ex. 1, Egbarin Aff., ¶ 52.  The mere fact alone that the Lewis defendants communicated with the Egbarins' attorney does not sufficiently evidence a violation of the FDCPA, i.e., it does not support the inference on the part of a reasonable fact finder that the content of the communication was harassing under section 1692(d)(2) or contained

misrepresentations in violation of section 1692e.[9]  Thus, the Egbarins' claim on the

basis of the November 2000 communication is also without merit.

In light of all of the foregoing, summary judgment on the Egbarins' FDCPA

claims is GRANTED in favor of the defendants.

### C.    The State Law Claims

Having granted summary judgment in favor of the defendants on the Egbarins'

federal claims, the court declines to exercise supplemental jurisdiction over the

Egbarins' state law claims.  Under 28 U.S.C. § 1367(c)(3), "[t]he district courts may

decline to exercise supplemental jurisdiction over a [state law] claim . . . if . . . the

district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C.

§ 1367(c)(3).  While dismissal of the state claims is not absolutely mandatory, Rosado

v. Wyman, 397 U.S. 397, 403-05 (1970); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343,

350 n.7 (1988), the basis for retaining jurisdiction is weak when the federal claims are

dismissed before trial.  United Mine Workers v. Gibbs, 38 U.S. 715, 726 (1966).

Accordingly, the court declines to exercise jurisdiction over the state law claims, and

those claims are dismissed.

### IV.    CONCLUSION

---

[9]To the extent that the Egbarins' section 1692e claim is premised on the argument that the defendants' collection efforts were aimed at collecting an unlawful debt, the Egbarins' claim accrued when the efforts began or when they became aware of the unlawful debt claim, and are not renewed with each communication regarding the debt. See Sierra, 48 F.Supp.2d at 394 (finding FDCPA claim accrued when settlement agreement containing illegal attorneys' fees was signed and rejected argument that "each new communication would start a fresh statute of limitations.").

For the foregoing reasons, the defendants' summary judgment motions [Dkt.

Nos. 54 & 57] are GRANTED.  The clerk of court is ordered to close the case.

**SO ORDERED.**

Dated this 30th day of January, 2006, at Bridgeport, Connecticut.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge